STATE OF VERMONT

ENVIRONMENTAL COURT

|  |  |  |
|---|---|---|
| In re Highlands Development Co., LLC | } | |
| and JAM Golf, LLC | } | Docket No. 194-10-03 Vtec |
| Master Plan Application | } | |

Decision and Order on Motion for Summary Judgment

Appellant-Applicants Highlands Development Co., LLC and JAM Golf, LLC (Applicants) appealed from a decision of the Development Review Board (DRB) of the City of South Burlington, approving 297 of the 358[1] residential dwelling units sought in Applicants' master plan application for a 450-acre Planned Unit Development (PUD). Applicants are represented by Mark G. Hall, Esq. and William A. Fead, Esq.; the City of South Burlington is represented by Steven F. Stitzel, Esq. and Amanda S.E. Lafferty, Esq.[2]

This 2003 appeal had been placed on inactive status, at the request of the parties, while issues related to the project involved in this application were litigated in the Vermont Supreme Court in In re Appeal of JAM Golf, LLC, 2008 VT 110, 185 Vt. 201, and were concluded on remand to this Court. In re: Appeal of JAM Golf, LLC, No. 69-3-02 Vtec (Vt. Envtl. Ct. June 12, 2009) (Wright, J.); In re: Appeal of JAM Golf, LLC, No. 69-3-02 Vtec (Vt. Envtl. Ct. Aug. 21, 2009) (Wright, J.). Applicants have now moved for summary judgment, asking the Court to invalidate several provisions of the 2003 South Burlington Land Development Regulations (2003 Regulations) as unconstitutionally vague, and to approve the master plan proposal in full, that is, to approve all of the

---

[1] But see footnote 5, below.

[2] In addition, Marie Ambusk has informational status in this appeal, but has not entered an appearance as a party.

residential dwelling units now proposed by Applicants rather than the 297 units approved by the DRB in its September 25, 2003 decision (DRB Master Plan Decision). The following facts are undisputed unless otherwise noted.

Procedural History of VNCC Planned Unit Development

Applicants own a 450-acre parcel of land located in the Southeast Quadrant zoning district of the City of South Burlington. Beginning in 1996, Applicants and their predecessors have developed a planned development on that parcel known as the Vermont National Country Club (VNCC). The development consists of an eighteen-hole golf course, a clubhouse and associated facilities, and thirteen residential developments, referred to in the DRB Master Plan Decision and in this decision as "development areas."[3]

The 2003 Regulations require applicants seeking to develop more than ten dwelling units in the Southeast Quadrant zoning district to obtain approval of an overall master plan for the development. 2003 Regulations § 15.07(B)(1). A master plan is defined as a "plan intended to guide the arrangement of developed areas and undeveloped areas and streets within a land development project." Id. art. 2. In addition, because each individual VNCC development area involves land within a Planned Unit Development, each individual development area must receive subdivision or site plan approval from the DRB. See id. §§ 14.02–.09 (governing site plan approval); id. § 15.08 (governing major subdivision and PUD approval).

Under the 2003 Regulations, Applicants seeking master plan approval for a development under § 15.07 may combine these two processes and apply concurrently

---

[3] Some of the proposed development areas consist solely of subdivisions of single-family lots. Other proposed development areas consist of single, duplex, or triplex townhouse units, or multiple-unit buildings, without associated lots. Some of the development areas include both subdivision lots, and townhouse or apartment units without associated lots.

for preliminary approval of any portion of the development that is subject to the master plan. See id. § 15.07(C)(2) ("The Master Plan application may . . . be combined with preliminary site plan or preliminary subdivision plat review for a discrete portion or all of the property proposed for development.").[4]

The 2003 Regulations were the first zoning or land use ordinance in South Burlington to incorporate provisions requiring approval of a master plan for certain developments. Therefore, although a large portion of the VNCC had already been approved under previous regulations and had been constructed, the requirement that Applicants obtain master plan approval was triggered when Applicants sought approval of more than ten additional dwelling units within the VNCC after the 2003 Regulations took effect. Accordingly, in 2003 Applicants submitted Master Plan Application No. MP-03-01 (the master plan application) to the DRB, seeking master plan approval for the entire VNCC PUD in connection with preliminary plat or site plan applications for several of the residential development areas within the PUD.

Between 1996 and the submission of the master plan application in 2003, the golf course itself, the clubhouse and associated facilities, and the following residential development areas had received prior subdivision or site plan approval from the DRB and had been constructed, or were under construction, as of 2003: the Four Sisters Road development area (37 residential units); the Nowland Farm Road development area, which is labeled on the site plan table as "Lots 39–42" (4 residential units); the Economou Farm Road development area (23 residential units); the Fairway Drive development area (36 residential units); the Holbrook/Tabor development area (26

---

[4] The DRB Master Plan Decision approving the master plan application, as well as the parties' memoranda in the present appeal, analyzes each development area separately for its compliance with the master plan criteria, even though the master plan is defined as a single, unified proposal; this decision follows the same methodology.

residential units); and the Golf Course Road development area (117 residential units[5]). Although these six developments had received prior DRB approval, the master plan application included them, as required by § 15.07(B)(1) of the 2003 Regulations.

Concurrently with the master plan application, as allowed under § 15.07(C)(2), Applicants submitted preliminary approval applications for two other development areas: the Water Tower Hill development area, which is labeled on the site plan table as "Lots 175–179" (9 residential units), and the Old Schoolhouse Road development area (15 residential units). These two development areas received preliminary approval concurrently with the master plan approval.[6]

In addition to the eight development areas discussed above, the master plan application proposed five development areas that had not received preliminary approval from the DRB for some or all of the number of units sought by Applicants in the master plan application for each development area. These five areas are: the

---

[5]  Some confusion has been created by the fact that the master plan application lists the Golf Course Road development area as having 118 units (32 lots and 86 townhome units), yet the DRB Master Plan Decision refers to it as having 117 approved units.  DRB Master Plan Decision, at 10.  It is possible that this discrepancy resulted from the reconfiguration of lots necessary to provide the development driveway for the Taft Subdivision development area.  See Appeal of JAM Golf, No. 69-3-02 Vtec, slip op. at 3 (Vt. Envtl. Ct. June 29, 2006).  Neither party has alluded to or resolved this factual discrepancy in this appeal; however, as Applicants do not challenge it, it is not a material disputed fact.  This decision will therefore treat the Golf Course Road development area as having 117 units, which reduces the total number of units sought by Applicants in this master plan appeal to 357, rather than the 358 units originally sought in the master plan application.

[6]  The DRB granted preliminary approval for the Water Tower Hill development area (Application Nos. SD-03-24 and SD-03-26) and the Old Schoolhouse Road development area (Application Nos. SD-03-25 and SD-03-27) concurrently with its decision on the master plan.  The DRB incorporated by reference its decisions regarding the applications for those two development areas into the Master Plan Decision.  DRB Master Plan Decision, at 2.

4

Clubhouse development area[7] (8 proposed residential units); the Park Road development area (18 proposed residential units); the Heatherfields/Lot 108 development area (49 proposed residential units); the Old Cross Road development area (5 residential units); and the Taft Subdivision development area, which is labeled on the site plan table as "13th Hole Subdivision" (10 proposed residential units).

On September 25, 2003, the DRB issued its decision granting approval, with conditions, of 297 of the residential units proposed in Applicants' master plan application. DRB Master Plan Decision, at 9. The DRB Master Plan Decision evaluated the proposed master plan under the general master plan criteria applicable to all applications, see 2003 Regulations §§ 15.18(A)(1)–(10), as well as under the master plan criteria applicable only to the Southeast Quadrant zoning district, see id. §§ 15.18(B)(1)–(7).

In its decision, the DRB affirmed its previous findings and granted master plan approval for the six development areas that had been approved prior to the submission of the master plan application. DRB Master Plan Decision, at 11–12.[8] The DRB also granted master plan approval for the twenty-four residential units in the two development areas that had concurrently obtained preliminary approval: nine residential units in the Water Tower Hill development area and fifteen residential units in the Old Schoolhouse Road development area. Id. The DRB determined that all eight of these development areas, comprising 267 residential units, satisfied all applicable

---

[7] This residential area is distinct from the clubhouse proper and its associated facilities; the Clubhouse residential development area is named for its location on the east side of Dorset Street, across from the clubhouse proper.

[8] While the DRB Master Plan Decision does not refer in its text to the four single-family lots in the Nowland Farm Road development area, the table at page 10 of the decision identifying each master plan development area does include those units, and the total number of units approved in the decision also includes those four lots.

master plan criteria. Id. at 6.[9] No issues as to the master plan approval of these development areas have been raised in this appeal.

The remaining five development areas—the Clubhouse, Park Road, Heatherfields/Lot 108, Old Cross Road, and Taft Subdivision development areas—were either denied in part or denied in their entirety by the DRB in the Master Plan Decision. Id. at 11–12. These five development areas, consisting of a total of ninety proposed residential units, are the development areas that Applicants initially appealed to this Court in this appeal. Each of these five areas is discussed in further detail below.

Procedural History of Taft Subdivision Development Area Litigation

In 2001, prior to the 2003 submission of the master plan application, Applicants had submitted subdivision application No. SD-01-42, seeking preliminary plat approval for the ten-lot Taft Subdivision development area. That subdivision application was denied by the DRB; on appeal it was also initially denied by the Environmental Court for failing to satisfy §§ 26.151(g) and (l) of the 2002 Regulations. Appeal of JAM Golf, No. 69-3-02 Vtec, slip op. at 4–5 (Vt. Envtl. Ct. June 12, 2006).

On appeal, the Vermont Supreme Court invalidated § 26.151(g) of the 2002 Regulations, which required Planned Residential Developments to "protect important natural resources," because that section was "essentially standardless" and therefore "violate[d] property owners' due process rights." Appeal of JAM Golf, 2008 VT 110, ¶¶ 13–14. The Supreme Court also invalidated § 26.151(l) of the 2002 Regulations,

---

[9] The previous site plan or subdivision approvals for the Four Sisters Road, Nowland Farm Road, Economou Farm Road, Fairway Drive, Holbrook/Tabor, and Golf Course Road development areas were granted under the 2002 South Burlington Zoning Regulations (2002 Regulations) or an earlier set of regulations. In the Master Plan Decision, the DRB nevertheless granted master plan approval for these development areas under the 2003 Regulations without analyzing each area, that is, the DRB determined that these six development areas met all the master plan criteria because they had already received prior approval under earlier zoning ordinances.

which required conformance with the City's Comprehensive Plan, as applied to the wildlife corridor and landscape feature issues decided in that case, because as to those issues the Comprehensive Plan itself contained "no specific standards to guide enforcement" and was "too ambiguous to be enforceable." Id. at ¶¶ 17–19.[10]

Applying the Supreme Court's analysis on remand, this Court invalidated the portion of § 26.151(i) of the 2002 Regulations that required proposed projects to "provide convenient allocation and distribution of common open space in relation to proposed development," because that portion of the provision was unconstitutionally "standardless and vague." Appeal of JAM Golf, No. 69-3-02 Vtec, slip op. at 5–6 (Vt. Envtl. Ct. June 12, 2009). On the other hand, the Court upheld § 26.151(h) of the 2002 Regulations, which required that "there will be no undue adverse effect on the scenic or natural beauty of the area" and that "the proposed development will be aesthetically compatible with the surrounding developed properties," because that provision used language comparable to Act 250 Criterion 8, 10 V.S.A. § 6086(a)(8), and was therefore "not too vague to be enforceable." Id. at 6–10. This Court's subsequent decision on the merits of the proposal determined that the Taft Subdivision satisfied the remaining applicable subdivision regulation, § 26.151(h) of the 2002 Regulations, and therefore granted preliminary plat approval for that development area. Appeal of JAM Golf, No. 69-3-02 Vtec (Vt. Envtl. Ct. Aug. 21, 2009).

Because the ten-unit Taft Subdivision has now received preliminary plat approval, the ten units proposed in the master plan application for that development area also satisfy the requirements for master plan approval. That is, the Taft

---

[10] However, it is important to note that the Supreme Court did determine that such a provision, requiring conformance with a comprehensive plan, was a permissible method of regulation. See id. at ¶¶ 16–19 ("[C]ities may require subdivisions to conform to their city plan" as long as there is a "specific policy set forth in the plan," and the policy is "stated in language that is clear and unqualified, and creates no ambiguity." (quoting In re John A. Russell Corp., 2003 VT 93, ¶ 16, 176 Vt. 520)).

7

Subdivision preliminary plat approval is essentially incorporated into the master plan approval and that development area is approved in full in the master plan, just as the DRB did with the six development areas that had received preliminary approval under previous regulations prior to the submission of the master plan application. See DRB Master Plan Decision, at 11 (stating that the DRB "affirms its prior positive findings of fact and conclusions regarding the six (6) [areas] previously approved" under prior regulations, and granting those areas master plan approval in full). Therefore, like those six development areas, as well as the Water Tower Hill and Old Schoolhouse Road development areas, the Taft Subdivision development area is no longer at issue in the present appeal.

Development Areas at Issue in this Appeal

As discussed above, the Four Sisters Road, Nowland Farm Road, Economou Farm Road, Holbrook/Tabor, Golf Course Road, Water Tower Hill, and Old Schoolhouse Road development areas that were approved in the DRB Master Plan Decision, together with the Taft Subdivision development area, are not at issue in this appeal. The remaining four development areas proposed in the master plan application and at issue in this appeal are the Clubhouse, Park Road, Heatherfields/Lot 108, and Old Cross Road development areas. These four development areas account for eighty of the residential units proposed in the master plan application, thirty of which were granted master plan approval by the DRB. In this de novo proceeding, Applicants seek master plan approval of all eighty units proposed for these four development areas, that is, all fifty units that were disapproved by the DRB as well as the thirty units that were granted master plan approval.

8

<u>Clubhouse and Park Road Development Areas</u>

In evaluating the master plan as a whole for compliance with §§ 15.18(A)(4), (5), (6), and (10), and §§ 15.18(B)(1) through (4), of the 2003 Regulations, the DRB stated that the proposed master plan layout met each of those criteria, with the exception of the Taft Subdivision, Old Cross Road, and a portion of the Heatherfields/Lot 108 development areas.  DRB Master Plan Decision, at 6.  This statement implies that at least the layout of the proposed Clubhouse and Park Road development areas met the criteria in §§ 15.18(A)(4), (5), (6), and (10), and §§ 15.18(B)(1) through (4), of the 2003 Regulations.   Nevertheless, the DRB Master Plan Decision limited the number of residential units approved for both the Clubhouse and the Park Road development areas.  <u>Id</u>. at 11–12.

The Clubhouse development area, consisting of former lots 169-172, but labeled on the site plan table as "Lots 169–174," proposed eight residential units in four duplex buildings.  According to the site plan submitted by Applicants, this development area had previously received approval for four single family lots.  See also DRB Master Plan Decision, at 3 (stating that the Clubhouse development area was previously approved for four "units").  In the Master Plan Decision, the DRB approved only six of the eight units proposed in the master plan application, "due to the presence of wetlands constraints and the high visibility of this property."  <u>Id</u>. at 11.[11]

The Park Road development area, consisting of former lots 173 and 174, but not separately listed on the site plan table, proposed eighteen residential units in six triplex

---

[11] Even though the DRB omitted the Clubhouse development area from the list of development areas whose layout failed to meet the criteria in §§ 15.18(A)(4), (5), (6), and (10), and §§ 15.18(B)(1) through (4), the DRB's limitation of the number of units due to "wetlands constraints" and due to the "high visibility" of the property suggests that the applicable regulatory sections may be §§ 15.18(A)(4) and (5), related to protection of wetlands, and § 15.18(B)(3), related to a project's visual compatibility with the area.

9

buildings. Id. at 3.[12] The site plan submitted by Applicants shows that the portion of this development area composed of former lots 173 and 174 had previously been approved as two single-family lots. The DRB decision approved only twelve of the eighteen proposed residential units, without stating which buildings or units were approved, or whether some different configuration of units would be required. See id. at 12 (stating that the "Park Road area is approved for development of a maximum of twelve (12) residential units in any configuration"). The DRB approval of the twelve residential units for the Park Road development area was issued subject to a condition requiring Applicants to obtain access over the City-owned land between Park Road and the project property. Id. The DRB omitted the Park Road development area from the list of development areas whose layout failed to meet the criteria in §§ 15.18(A)(4), (5), (6), and (10), and §§ 15.18(B)(1) through (4), id. at 6, thereby implying that this area's layout met all the applicable criteria. Nevertheless, the DRB did not cite any specific regulatory section, or state any other reason, in reducing the number of units in the Park Road development area from eighteen to twelve. Id. at 6, 12.

Old Cross Road and Heatherfields/Lot 108 Development Areas

The Old Cross Road development area, labeled on the site plan table as "14th Hole Subdivision," proposed five single-family residential lots, none of which had previously been proposed or approved. See DRB Master Plan Decision, at 3 (listing the Old Cross Road development area as one that had "no existing, valid City preliminary

---

[12] The site plan submitted by Applicants in conjunction with their master plan application appears to show seven triplex residential buildings (as well as a single unlabeled building), one of which appears to extend off the project property to the north, between the project boundary and Park Road. Material facts are in dispute, or at least have not been provided to the Court, regarding the layout of the eighteen residential units in the Park Road development area for which Applicants seek approval in the present proceeding, as well as the layout of the twelve residential units approved by the DRB.

plat approval at the time the Master Plan application was filed"). The DRB approved none of the five proposed residential units for the Old Cross Road development area. Id. at 12.

The Heatherfields/Lot 108 development area proposed forty-nine residential units in five nine-unit buildings and four townhouses.[13] The DRB approved only twelve of the forty-nine proposed residential units for the Heatherfields/Lot 108 development area, and required that all twelve of those units be placed westerly of the buffer for a stream running through that development area, leaving the easterly portion of that area undeveloped. Id. at 12.[14]

The DRB decision stated that, other than the twelve units in the limited area the DRB approved for the Heatherfields/Lot 108 development area, the proposals for the Heatherfields/Lot 108 and the Old Cross Road development areas, considered together with the Taft Subdivision development area, did not satisfy §§ 15.18(A)(4), (5), (6), and (10), and §§ 15.18(B)(1) through (4), of the 2003 Regulations. Id. at 6. The DRB Master Plan Decision discussed the Old Cross Road and the Heatherfields/Lot 108 development areas, together with the now-approved Taft Subdivision, as being "within the corridor formed by the eastern property boundary and the Golf Course/Park Road [development] area." Id. The DRB decision stated that development of all three of these development areas was inconsistent "with the conservation of wetlands, streams,

_____

[13] This development area's 1996 preliminary plat approval for thirty-one units had expired, requiring Applicants to submit a new application.

[14] The DRB determined that development within the 4.6-acre Heatherfields/Lot 108 development area should be limited to the area west of a line "one hundred (100) linear feet west of the center line of the stream" located in the area. DRB Master Plan Decision, at 12. Material facts are in dispute, or at least have not been provided to the Court, regarding how the DRB calculated the number of units it allowed in the approved western portion of that development area. In any event, the issue of the number and placement of residential units in this development area remains for the hearing on the merits of this case.

11

and wildlife habitat and unique natural features"[15]; that the proposed development of these three areas would "adversely affect[] the VNCC's visual compatibility with its surroundings"[16]; and that the development of these three areas would have a "pronounced adverse impact on the City's ability to keep open spaces arranged in a manner that maximizes contiguous open spaces and buffers."[17] Id. at 6–7. In addition, specifically with regard to the five-lot subdivision proposed for the Old Cross Road development area, the DRB decision stated that the proposal "interferes with an important wildlife habitat in the meaning of the [2003 Regulations] and Comprehensive Plan, and does not retain the connectivity between larger lots to the south and the City's open space parcels to the north." Id. at 12.

Standards Applicable to the Present Proceeding

In a de novo proceeding, "the Court sits in place of the [DRB] to consider what was before the [DRB], applying the substantive standards that were applicable before the [DRB]." In re: Kibbe Zoning Permit, No. 173-8-07 Vtec, slip op. at 1–2 (Vt. Envtl. Ct. Nov. 6, 2008) (Wright, J.) (citing V.R.E.C.P. 5(g); 10 V.S.A. § 8504(h)). As the present matter is de novo before the Court, and the Statement of Questions raises the issue of the appropriate number of units for each of the four development areas on appeal, it will be for this Court to determine whether each of the contested development areas meets the applicable master plan criteria and to determine the number of units in each area that should be approved in the master plan. These issues are before the Court even for the layout of the Clubhouse and Park Road development areas, which the DRB

---

[15] Although the DRB decision did not cite specific sections of the 2003 Regulations, this language is reflected in §§ 15.18(A)(4) and (10), and in §§ 15.18(B)(1), (2), and (3).
[16] Although the DRB decision did not cite specific sections of the 2003 Regulations, this language is reflected in §§ 15.18(A)(5) and (10).
[17] Although the DRB decision did not cite specific sections of the 2003 Regulations, this language is reflected in §§ 15.18(A)(6) and (10), and §§ 15.18(B)(1), (2), and (4).

implicitly concluded met all applicable master plan criteria, because the DRB decision nevertheless reduced the number of allowable lots in these two areas.

In this summary judgment motion, Applicants challenge §§ 15.18(A)(4), (5), (6) and (10), and §§ 15.18(B)(1) through (4), of the 2003 Regulations, asserting that each provision is unconstitutionally vague and unenforceable, based on the reasoning articulated by the Vermont Supreme Court in Appeal of JAM Golf, 2008 VT 110.[18] Applicants ask the Court to strike down each of the challenged provisions, and therefore to approve the master plan application in full under any remaining applicable provisions.

When interpreting and applying administrative or municipal regulations, "the Court approaches regulatory construction in the same manner as statutory interpretation." In re Sheffield Wind Project, No. 252-10-08 Vtec, slip op. at 3 (Vt. Envtl. Ct. Sept. 29, 2009) (Wright, J.) (citing In re Williston Inn Group, 2008 VT 47, ¶ 14, 183 Vt. 621). When construing a statute or regulation, the Court must begin with a presumption of constitutionality. See Hunter v. State, 2004 VT 108, ¶ 31, 177 Vt. 339 (stating that courts "begin with an assumption that the legislation is constitutional" (citing Benning v. State, 161 Vt. 472, 481 (1994))). Generally, statutes and regulations "should be construed to avoid constitutional difficulties, if possible," In re G.T., 170 Vt. 507, 517 (2000), because a court ought "not decide constitutional questions

---

[18] The ordinance provisions considered by the Supreme Court and this Court in the Taft Subdivision appeal, see Appeal of JAM Golf, 2008 VT 110; Appeal of JAM Golf, No. 69-3-02 Vtec (Vt. Envtl. Ct. June 12, 2009), were from § 26.151 of the 2002 Regulations, rather than the 2003 Regulations at issue in the present appeal, because the earlier regulations were in effect when the Taft Subdivision application was filed. The DRB reviewed the present application under § 15.18 of the 2003 Regulations, covering PUDs, Subdivisions, and Master Plans, because the 2003 Regulations were in effect when the master plan application was submitted. However, the same version of the City's Comprehensive Plan, referenced in both the 2002 and 2003 Regulations, was in effect when both applications were filed.

13

unnecessarily." In re Picket Fence Preview, 173 Vt. 369, 375 (2002) (citing State v. Clarke, 145 Vt. 547, 551 (1985)). Therefore, where a reasonable alternative for resolution exists, the court will avoid overturning a regulation on constitutional grounds. See Central Vt. Ry., Inc. v. Dep't of Taxes, 144 Vt. 601, 604 (1984) (stating that a court will avoid construction that "may lead to the unconstitutionality of the statutory provision if a reasonable alternative exists" (citing Hadwen, Inc. v. Dep't of Taxes, 139 Vt. 37, 39 (1980))).

In order to survive a constitutional challenge for vagueness, "a zoning ordinance must be shown to articulate standards that sufficiently guide municipal decisions and give notice to those seeking an understanding of what is regulated." In re Irish Construction Application, No. 44-3-08 Vtec, slip op. at 6 (Vt. Envtl. Ct. Nov. 2, 2009) (Durkin, J.) (citing In re Handy, 171 Vt. 336, 344–45 (2000)). This standard similarly applies to provisions of a municipal plan that are made applicable to a project by an ordinance or regulation. See In re Times & Seasons, LLC, 2008 VT 7, ¶¶ 21–22, 183 Vt. 336 (Where a specific provision "requires compliance with a duly adopted town or regional plan," that plan must set forth a "specific policy" that is "stated in language that is clear and unqualified, and creates no ambiguity." (quoting John A. Russell Corp., 2003 VT 93, ¶ 16)). If an ordinance or applicable municipal plan provision is completely devoid of standards specific enough to guide decisionmakers and applicants in analyzing a proposal, thereby "leading to 'unbridled discretion'" by the reviewing body, such an ordinance violates the landowner's due process rights, and therefore must be struck down as unconstitutionally vague. Appeal of JAM Golf, 2008 VT 110, ¶ 13–14.

On the other hand, although municipal ordinances "should not leave the door open to unbridled discretion," and therefore must articulate standards to guide decisionmakers, they should also "be general enough to avoid inflexible results." Appeal of JAM Golf, No. 69-3-02 Vtec, slip op. at 3 (Vt. Envtl. Ct. June 12, 2009) (quoting

14

Town of Westford v. Kilburn, 131 Vt. 120, 125 (1973)). Therefore, if a municipal ordinance contains language that is vulnerable to a constitutional challenge on the basis of its vagueness, a court will look to "external sources to interpret and clarify [the] provision" in an effort to avoid a finding of unconstitutionality. Id. at 4, n.2. In doing so, courts may look to "the entire ordinance, not just the challenged subsection," id. (quoting In re Pierce Subdivision Application, 2008 VT 100, ¶ 20, 184 Vt. 365), the "historical usage" of the challenged language, id. at 4 (citing Handy, 171 Vt. at 348–49), and "relevant precedents and prior legislation" that may provide specificity in interpreting the provision. Id. (quoting Heffernan v. Harbeson, 2004 VT 98, ¶ 9, 177 Vt. 239).

As seen in the analysis applied by the Vermont Supreme Court in Appeal of JAM Golf, 2008 VT 110, a regulatory provision must provide standards by which the DRB, or the Court in a de novo appeal, can perform two functions in determining whether a particular proposal satisfies the regulation. First, the regulatory provision must be specific enough to allow the decisionmaker clearly to identify the resources or features to be protected. Second, the regulation must also provide standards by which the decisionmaker can discern the degree or level of protection that must be achieved for each identified resource or feature.

An example of a regulatory provision analyzed in Appeal of JAM Golf that failed to identify the resource to be protected is the reference to "scenic views" found in the Comprehensive Plan, made applicable through § 26.151(l) of the 2002 Regulations. See 2008 VT 110, ¶ 18. The Supreme Court determined that, as it applied to the view of landscape features at issue regarding the Taft Subdivision, the Plan unconstitutionally left the determination of what constituted a "scenic view" to the "unfettered discretion" of the reviewing body. Id. See also id. (stating that "the city plan fails to define what in particular is to be protected").

An example of a regulatory provision analyzed in Appeal of JAM Golf that failed

adequately to describe the appropriate level of protection for an identified resource or feature is § 26.151(g) of the 2002 Regulations, which simply required the design of a development to "protect" certain features. See id. at 14 (stating that the "language of the regulations offers no guidance as to what degree of preservation short of destruction is acceptable"). That is, even if the resource or feature under consideration is clear—for example, a clearly mapped stream or wetland—a regulatory provision is unconstitutionally vague if it provides no standards "to apply in determining what would constitute a failure to 'protect' the listed resources" or "as to how or when development should be restricted to accomplish protection." Id. ¶¶ 13, 18.

In determining whether the challenged regulatory provisions are unconstitutionally vague, the Court must therefore analyze, for each provision, both whether it defines what in particular is to be protected, and whether it provides standards for the Court to apply as to the required degree or level of protection.

Regulatory Provisions Regarding Wetlands, Streams, Wildlife Habitat, and Other Natural Features

Section 15.18(A)(4) of the 2003 Regulations requires that:

The project's design respects and will provide suitable protection to **wetlands, streams, wildlife habitat** as identified in the Open Space Strategy,[19] and any **unique natural features** on the site.[20] In making this finding the DRB shall utilize the provisions of Article 12 of these Regulations related to the wetlands and stream buffers, and may seek comment from the Natural Resources Committee with respect to the project's impact on natural resources.

---

[19] The summary judgment materials do not appear to include a copy of the Open Space Strategy referred to in these subsections of the 2003 Regulations.

[20] The various sections of 2003 Regulations § 15.18(A) contain phrases emphasized in bold type in the original, as shown in the quotation of each such section discussed in this decision.

16

Section 15.18(B)(3) of the 2003 Regulations requires that:

Existing natural resources on each site shall be protected through the development plan, including streams, wetlands, floodplains, wildlife habitat and corridors including those areas identified in the South Burlington Open Space Strategy, and special natural and/or geological features such as mature forests, headwaters areas, and prominent ridges.

The DRB denied the Old Cross Road development area and the easterly portion of the Heatherfields/Lot 108 development area, as well as the Taft Subdivision development area, on the basis that development of these three areas, considered together, was "not consistent with" the "conservation" of "wetlands, streams, wildlife habitat and unique natural features." DRB Master Plan Decision, at 6. However, although the DRB decision refers to the term "unique natural features," the decision does not identify any specific "unique natural feature" in the Old Cross Road or Heatherfields/Lot 108 development areas that would require consideration under § 15.18(A)(4). With regard to the Old Cross Road development area, the DRB stated that its development "interferes with an important wildlife habitat in the meaning of the [2003 Regulations] and the Comprehensive Plan." Id. at 12. The DRB also based its approval of only six of the eight units proposed for the Clubhouse development area, in part, on "the presence of wetlands constraints." Id. at 11.

The provision in the 2002 Regulations analogous to §§ 15.18(A)(4) and (B)(3) was § 26.151(g), which required the proposed project to "protect important natural resources including streams, wetlands, scenic views, wildlife habitats, and special features such as mature maple groves or unique geological features." The Vermont Supreme Court struck down this section on the basis that "it provides no standards for the court to apply in determining what would constitute a failure to 'protect' the listed resources" and that its language "offers no guidance as to what degree of preservation short of destruction is acceptable." Appeal of JAM Golf, 2008 VT 110, ¶¶ 13–14.

Section 15.18(B)(3) of the 2003 Regulations, and § 15.18(A)(4) only with regard to unique natural features,[21] are as lacking in standards as was the section of the 2002 Regulations struck down by the Supreme Court. Regardless of whether they sufficiently define which resources are to be protected, they fail to state or to refer the reader to standards for the court to apply in determining what would constitute a failure to protect those resources.[22]

On the other hand, at least as to wetlands and stream buffers, § 15.18(A)(4) incorporates by reference other detailed standards, from Article 12 of the 2003 Regulations, that adequately specify the resource to be protected and define the required level of protection. Article 12 of the 2003 Regulations designates the surface waters in South Burlington which are to be protected, including wetlands and stream buffers, and provides detailed specific standards for protection of those features.

As to wildlife habitat, § 15.18(A)(4) incorporates by reference the City's Open Space Strategy, which has not been provided to the Court in connection with the present motions. Without that document, material facts are in dispute, or at least have not been provided to the Court, to allow the Court to determine whether the Open Space Strategy identifies the "wildlife habitat" that must be protected and defines what

---

[21] The DRB decision does not specify, and the City does not argue in its memoranda, whether any (or which) unique natural features may be located in the Old Cross Road or Heatherfields/Lot 108 development areas. If no unique natural features are in fact sought to be protected with regard to the development areas remaining at issue in this appeal, then the Court is precluded from reaching the constitutional issue as to this phrase of § 15.18(A)(4). See discussion at pp. 13–14, above.

[22] No party suggests that the remaining mechanism provided in § 15.18(A)(4), allowing the DRB, and hence this Court, to obtain comments from an advisory committee, can cure an otherwise vague regulatory provision. While an advisory committee may be useful in helping a decisionmaker to determine whether a particular project meets a stated standard, see 24 V.S.A. § 4403(6), such a committee cannot be delegated standardless discretion, just as a DRB or a court is precluded from exercising such standardless discretion. Handy, 171 Vt. at 348–49.

level of protection of wildlife habitat is "suitable" in this location.

Therefore, summary judgment is granted to the City that § 15.18(A)(4) is sufficiently definite to be applied by the Court to the contested development areas with respect to the protection of wetlands and stream buffers. Summary judgment is granted to Applicants that § 15.18(B)(3) is too vague to be applied by the Court to the contested development areas, and that, if any of the areas contain "unique natural features," § 15.18(A)(4) is too vague to be applied by the Court to the contested development areas with respect to the protection of unique natural features. Summary judgment is denied as to whether § 15.18(A)(4) is sufficiently definite to be applied by the Court to the contested development areas with respect to the protection of wildlife habitat, as material facts regarding the Open Space Strategy have not been provided to the Court.

Regulatory Provisions Regarding Contiguity of Open Space
and Stream Buffers

Section 15.18(A)(6) of the 2003 Regulations requires that:

**Open space areas** on the site have been located in such a way as to maximize opportunities for creating contiguous open spaces between adjoining parcels and/or stream buffer areas.

Section 15.18(B)(4) of the 2003 Regulations requires that:

Consistent with [§ 15.18(B)(1) through (3)], dedicated open spaces shall be designed and located to maximize the potential for combination with other open spaces on adjacent properties.

Both of these sections focus on preserving the potential for creating contiguity of open space on the project property with open space on adjacent property. Neither section is analogous to § 26.151(i) of the 2002 Regulations, dealing with the "convenient allocation and distribution of common open space in relation to proposed development," which was struck down by this Court in Appeal of JAM Golf, No. 69-3-02 Vtec, slip op. at 3 (Vt. Envtl. Ct. June 12, 2009).

19

Rather, in applying §§ 15.18(A)(6) and (B)(4) of the 2003 Regulations, the DRB (or the Court in this de novo appeal) can determine from the plain language of these sections both what is the resource to be protected, and what degree of protection is required. The resource to be protected is the potential or opportunity for future contiguity of open space on the project property with open space, including stream buffers, on adjacent property. The degree of protection is to "maximize" that potential, that is, to ensure to the greatest extent possible that development and open space on the site are located so as to avoid blocking the opportunity to link such open space with open space on adjacent property.

This specific regulatory technique of preserving the opportunity for contiguity with adjoining properties is well settled in Vermont, as is the more general regulatory technique of preserving the future "potential" of a feature or resource. For example, a subdivision ordinance, such as § 401.1(a) of the South Burlington Subdivision Ordinance in effect prior to the 2003 Regulations,[23] may require that streets in a proposed subdivision be placed so as to continue streets from existing adjoining subdivisions, and to allow the projection of streets through adjoining property not yet developed. See also 24 V.S.A. § 4418(1)(C) ("In order to guide community settlement patterns and to ensure the efficient extension of services, utilities, and facilities as land is developed," subdivision bylaws shall contain "[s]tandards for the design and configuration of parcel boundaries and location of associated improvements necessary to implement the municipal plan and achieve the desired settlement pattern for the neighborhood, area, or district in which the subdivision is located.").

Similarly, Act 250 criteria 9(B) and 9(C), regarding soils for agriculture or commercial forestry, address the preservation of the agricultural or forestry "potential"

_____

[23] Although the former South Burlington Subdivision Ordinance has not been provided to the Court in connection with this appeal, it, like the former Zoning Regulations, was provided in evidence in Appeal of JAM Golf, Docket No. 69-3-02 Vtec.

of such soils, and require an analysis of the effect of proposed development on the agriculture or forestry "potential" of adjoining lands.  See 10 V.S.A. §§ 6086(a)(9)(B) (requiring an analysis of whether a proposal "will not result in any reduction in the agricultural potential of the primary agricultural soils"); id. § 6086(a)(9)(C) (requiring an analysis of a proposal "for development or subdivision of productive forest soils" to determine if the proposal "will not result in any reduction in the potential of the those soils for commercial forestry").

Accordingly, summary judgment is granted to the City that §§ 15.18(A)(6) and (B)(4) are sufficiently definite to be applied by the Court to the contested development areas.


Regulatory Provisions Regarding Visual Compatibility and Aesthetics

Section 15.18(A)(5) of the 2003 Regulations requires that:

The project is designed to be **visually compatible** with the planned development patterns in the area, as specified in the Comprehensive Plan and the purposes of the zoning district(s) in which it is located.

In order to be upheld, this provision must provide sufficient standards for the Court to apply, first, to identify what the "planned development patterns" are in the area by looking to the Plan and the purposes of the zoning district, and, second, to determine whether the proposed project will be "visually compatible" with those planned development patterns.

The development patterns referenced in the purpose statement in § 9.01, together with the development patterns that are described as planned for the Southeast Quadrant in Chapter VII of the Comprehensive Plan, are sufficiently specific to identify the development patterns with which the proposed project must be "visually

21

compatible."[24]

The "purpose" section of the 2003 Regulations for the Southeast Quadrant zoning district, § 9.01, refers to the "open character" or "open space character" of the district, and to the "location and clustering" of buildings and lots so as to preserve that character. The Comprehensive Plan articulates the development patterns planned for the future of the Southeast Quadrant.[25] It describes the proposed patterns, which are the features that must be identified by a reviewing body under § 15.18(A)(5). Most importantly, the plan includes a development map entitled the "SEQ Goals Based Plan,"[26] which "identifies areas within the Quadrant which are appropriate for development and applies desirable neighborhood densities to those areas." Id. at 49; see id. at app. E (setting forth the SEQ Goals Based Plan map). The SEQ Goals Based Plan map, together with the text of the Comprehensive Plan related to the Southeast Quadrant, gives the reviewing body enough guidance to determine what the "planned development patterns" are in the area of a proposed project.

---

[24] Although the Natural Resources chapter of the Comprehensive Plan also refers to the planned preservation of certain natural features and scenic views in the Southeast Quadrant, none of the references that are sufficiently specific appear to refer to the development areas contested in this appeal. For example, the Natural Resources section of the Plan refers to the Southeast Quadrant as containing "several special features . . . [that] are worthy of protection," but the only features that are specifically listed are the sources of certain watercourses or water features that are not at issue in the present case. Comprehensive Plan, ch. VIII, at 48.

[25] The Plan also describes the existing development patterns in the Southeast Quadrant, stating that, among other things, it "remains the most rural area in the City"; consists "predominately of large-lot, low-density residential use and open land" and "a mixture of land uses including both neighborhood and rural residential, open fields, wooded ridges, a couple of dairy farms, and [the VNCC] 18-hole golf course and country club"; "is generally characterized by . . . many drainageways, ponds, streams, wetlands, a fen, and other wet areas"; and contains "many of the City's most scenic views." Comprehensive Plan, ch. VIII, at 47–48, 53.

[26] The Southeast Quadrant zoning district is abbreviated in the title of this map as "SEQ."

22

In the area of the VNCC in which the contested development areas are located, the Plan contemplates a mix of residential and open space development, and the protection of certain natural features such as wetlands. The Plan shows areas suitable for various densities of residential development, and areas not suitable for development, some of which are specifically shown as wetlands or floodplain. With regard to residential development, unlike the large-lot, low density residential development described as an existing development pattern, the Comprehensive Plan contemplates development of "a variety of housing types . . . in terms of development densities and design," and a variety of "development patterns and layouts," including "single and multi-family units," "affordable to moderate income hous[ing]," and developments that "preserve[] open space with an emphasis on contiguous areas, natural areas and views[,] through the use of such planning [techniques] as clustering." Id. at 48–49, 54–55. The Plan sets the overall future density of the Quadrant "in the low [to] moderate range" of "4,100 to 4,200 residential units," id. at 54, and proposes to "retain agriculture as a land use in the Quadrant" and to encourage "other low-intensity 'open space' uses," such as "botanical gardens, community gardens, nurseries and hobby farms." Id. at 50, 54.

By looking at the Comprehensive Plan and the SEQ Goal Based Plan map, the reviewing body is able to identify the areas planned for future development, the type of future development, and the desired future neighborhood densities for the area, as well as the planned development patterns for open space and natural features. Therefore, the phrase "planned development patterns in the area" is not impermissibly vague.

In addition to providing adequate guidance in determining the "planned development patterns in the area," § 15.18(A)(5) must also give the reviewing body guidance in determining whether the proposed project is "visually compatible" with those development patterns. As used in § 15.18(A)(5), the phrase "visually compatible" is not impermissibly vague, because it provides sufficient standards to guide a

23

reviewing body in applying § 15.18(A)(5) when considered together with the "historical usage" of the phrase, as well as with other "external sources" such as "relevant precedents and prior legislation" that provide specificity in interpreting the provision. Appeal of JAM Golf, No. 69-3-02 Vtec, slip op. at 3–4 (Vt. Envtl. Ct. June 12, 2009) (citing Handy, 171 Vt. at 348–49; Heffernan, 2004 VT 98, ¶ 9); see also Pierce Subdivision Application, 2008 VT 100, ¶ 24 (looking to "other provisions" in the ordinance to identify "specific limits to guide and check the Commission's discretion").

The requirement in § 15.18(A)(5) that a proposal be "visually compatible" with the planned development patterns in the area is similar to the requirement in § 26.151(i) of the 2002 Regulations, which was upheld by this Court, that a proposal be "aesthetically compatible" with current surrounding developments. See Appeal of JAM Golf, No. 69-3-02 Vtec, slip op. at 6–10 (Vt. Envtl. Ct. June 12, 2009). In upholding § 26.151(i), the Court discussed that the first prong of the Quechee Lakes test, used in analyzing Act 250 Criterion 8, "incorporates the inquiry required by the second clause of § 26.151(i), [which asks] whether the proposed project 'is aesthetically compatible with surrounding developed properties.'" See Appeal of JAM Golf, No. 69-3-02 Vtec, slip op. at 7–9 (Vt. Envtl. Ct. June 12, 2009).

The first prong of the Quechee Lakes test guides a reviewing body in determining a project's compatibility with the surrounding area by asking: "Will the proposed project be in harmony with its surroundings—will it 'fit' the context within which it will be located?" In re Quechee Lakes Corp., Permit Nos. 3W0411-EB & 3W0439-EB, Findings of Fact, Concl. of Law & Order, at 18 (Vt. Envtl. Bd. Nov. 4, 1985). The test goes on to look at several "factors" that "must be weighed collectively in deciding whether the proposed project is in harmony with—i.e., 'fits'—its surroundings." Id. The "historical usage" of this test provides adequate guidance to a reviewing body in applying § 15.18(A)(5), as § 15.18(A)(5) requires the same analysis and weighs the same factors required by the first prong of the Quechee Lakes test. The

24

fact that, under § 15.18(A)(5), the decisionmaker must compare the visual design of the proposed project with the planned development patterns for the surrounding area, rather than with its existing surroundings, does not invalidate the Quechee Lakes case test as sufficient guidance for applying § 15.18(A)(5).

Section 15.18(B)(2) of the 2003 Regulations requires that:

> Building lots, streets and other structures shall be located in a manner that maximizes the protection of open character, natural areas, and scenic views of the Quadrant identified in the Comprehensive Plan, while allowing carefully planned development at the overall base densities provided in these Regulations.

In order to be upheld, this provision must provide sufficient standards for the Court to apply, first, in determining the open character, natural areas, and scenic views identified in the Comprehensive Plan,[27] and second, in determining whether the lot layout, that is, the location of building lots, streets, and other structures, maximizes the protection of those listed features. As discussed above with regard to §§ 15.18(A)(6) and (B)(4), the term "maximize" is sufficiently definite to establish the degree of protection.

However, with regard to the protection of the "open character" of the Southeast Quadrant as identified in the Comprehensive Plan, "natural areas" in the Southeast

---

[27] Unlike the problem with "scenic views" articulated by the Supreme Court in Appeal of JAM Golf, that the view of the Taft Subdivision property was not a scenic view listed in the Plan, the Natural Resources chapter of the Plan specifically identifies scenic views as being of "the Green Mountains to the east and the Adirondacks and Lake Champlain to the west." Comprehensive Plan, at 62. That chapter also refers to Map 7 of the Comprehensive Plan, and to a specific Natural Resources Inventory Report and a Public Improvements/Scenic Views and Natural Area Inventory Study. However, as discussed below regarding § 15.18(A)(10), the Court will only address the constitutionality of this reference to scenic views if the scenic views identified in the Plan are at issue with regard to any of the contested development areas. See also discussion at pp. 13–14, above.

Quadrant as identified in the Comprehensive Plan, and "scenic views" from the Southeast Quadrant as identified in the Comprehensive Plan, the analysis for § 15.18(B)(2) is the same as for § 15.18(A)(10), discussed below.  To avoid reaching an unnecessary constitutional question, the Court will only reach the constitutional vagueness analysis regarding the protection of "open character," "natural areas" or "scenic views" if it is argued to be applicable to the merits of any of the four contested development areas.  If so, the Court will examine the Comprehensive Plan and the documents referenced in it to analyze whether § 15.18(B)(2) is sufficiently specific, as applied, at that time.

> Section 15.18(B)(1) of the 2003 Regulations requires that:
>
> Open space and development areas shall be located so as to maximize the aesthetic values of the property in keeping with the Comprehensive Plan goal of preserving and enhancing the open character, natural areas, and scenic views of the Quadrant, while allowing carefully planned development.

In order to be upheld, § 15.18(B)(1) must provide standards specific enough to guide a reviewing body in determining whether a proposal's open space and development areas are located "so as to maximize the aesthetic values of the property." While the requirement to "maximize" may describe a sufficiently specific level or degree of protection, § 15.18(B)(1) fails to provide any definition, standards, or guidance to determine what are the "aesthetic values" of any particular property.

The term "aesthetic values" is not defined in the 2003 Regulations or the Comprehensive Plan, nor has the City suggested any other source from which the DRB or this Court could tell what falls under the category of "aesthetic values" in general or specifically in the Southeast Quadrant zoning district.  The lack of guidance found in § 15.18(B)(1) amounts to a delegation of "standardless discretion to [the municipal DRB]," Handy, 171 Vt. at 348-49, which "violates property owners' due process rights."

26

<u>In re Miserocchi</u>, 170 Vt. 320, 325 (2000). Therefore, § 15.18(B)(1) is unconstitutionally vague and cannot be applied to this proposed development by this Court.

Summary judgment is therefore granted to the City that § 15.18(A)(5) is sufficiently definite to be applied by the Court to the contested development areas. Summary judgment is granted to Applicants that § 15.18(B)(1) is too vague to be applied by the Court to the contested development areas. Summary judgment is denied as premature, as to whether § 15.18(B)(2) is sufficiently definite to be applied by the Court, because that determination can only be made as applied to a particular issue raised in this litigation.

<u>Regulatory Provision Regarding Consistency with Comprehensive Plan Goals and Objectives for the Southeast Quadrant</u>

Section 15.18(A)(10) of the 2003 Regulations requires that:

The project is consistent with the goals and objectives of the **Comprehensive Plan** for the affected district(s).

As the Supreme Court explained in <u>Appeal of JAM Golf</u>, the regulatory technique or method of requiring a development to conform to the municipal plan is an allowed method of regulation. See 2008 VT 110, ¶¶ 16–19 ("[C]ities may require subdivisions to conform to their city plan" as long as there is a "specific policy set forth in the plan," and the policy is "stated in language that is clear and unqualified, and creates no ambiguity." (quoting <u>In re John A. Russell Corp.</u>, 2003 VT 93, ¶ 16)). However, if it is to be used in the regulatory context, the referenced plan must contain specific, unambiguous language stating adequate standards. <u>Id</u>. at ¶ 17; see also, e.g., 24 V.S.A. § 4414(3)(ii) (stating as one standard for conditional use approval that the proposal not have an undue adverse effect on the "character of the area, as defined by the . . . <u>specifically stated policies and standards</u> of the municipal plan" (emphasis added)).

27

The Supreme Court found the South Burlington Comprehensive Plan to be insufficiently specific on the two topics pertaining to the Taft Subdivision appeal: the standards regarding wildlife habitat and scenic views as applied to the Taft Subdivision development area under the 2002 Regulations. Id. ¶ 18. The Supreme Court did not examine the Comprehensive Plan as it applied to any other topics or development areas. Similarly, in the present appeal, this Court must avoid issuing an improperly advisory opinion and must avoid reaching an unnecessary constitutional question by limiting its analysis of the specificity of the Comprehensive Plan to only those sections of it that are at issue regarding any of the four development areas contested in this appeal. In addition, this Court is required to avoid a constitutional analysis except as necessary in the context of a case before it. See 24 V.S.A. § 4472(b) (stating that the Environmental Court's jurisdiction regarding the constitutionality of municipal bylaws and plans is limited to those issues that "arise[] in the context of" a specific case).

The only reference in the DRB Master Plan Decision to the Comprehensive Plan on its own—that is, separately from the references to the Comprehensive Plan incorporated in the text of §§ 15.18(A)(5), (B)(1) and (B)(2), which are already discussed above—is the statement that the new "west-to-east layout" proposed for the Heatherfields/Lot 108 development area and "the installation of road infrastructure across this area" directly contradicts the Comprehensive Plan. DRB Master Plan Decision, at 7.

Even though the Comprehensive Plan referenced in the present case is the same one as was analyzed in Appeal of JAM Golf, 2008 VT 110, the references to the Plan in § 15.18(A)(10) of the 2003 Regulations differ from its use in the former § 26.151(l) in two respects. First, § 15.18(A)(10) only requires "consistency" with elements of the

28

Comprehensive Plan, not "conformance."[28]   Second, § 15.18(A)(10) focuses on consistency of the proposal only with the specific goals and objectives stated in the Plan for the specific zoning district, rather than requiring conformance generally with the whole Comprehensive Plan.

As to the lot layout and associated road infrastructure layout for the Heatherfileds/Lot 108 development area, the goals and objectives in the Comprehensive Plan for the Southeast Quadrant zoning district are sufficiently specific regarding those topics.  Most importantly, while the Southeast Quadrant Goals Based Plan map shows the areas of the Taft Subdivision development area and the Old Cross Road development area as being "developable areas" of "neighborhood density 2,"[29] the area proposed for the eastern portion of the Heatherfields/Lot 108 development area is not shown as a developable area and is shown as containing wetlands.  Comprehensive Plan, at 164–65.  Beyond the map, the text of the Comprehensive Plan for the Southeast Quadrant lays out how the areas suitable for residential development, and their densities, were established to achieve the overall goal for the Southeast Quadrant zoning district to "encourage well[-]planned residential development at densities and layouts that protect and preserve large contiguous areas of open space . . . ," as well as to achieve the district's housing and natural resources goals and objectives.  Id. at 7.  It

---

[28]   That is, rather than having to make a positive showing that all aspects of the master plan application conform to or comply with an undefined set of applicable provisions in the Comprehensive Plan, the use of the term "consistent with" only requires an applicant to show that the master plan does not impede the achievement of the district goals and objectives.  Compare discussion in In re Reclassification of Ranch Brook, 146 Vt. 602 (1986), of the difference between the statutory standard that the existing classification is contrary to the public interest and the standard erroneously applied by the Water Resources Board that the requested reclassification is in the public interest. Id. at 605–06.

[29] These neighborhood densities are not found in the 2003 Regulations or the Plan; however, they may be described in the consultant study or other planning studies referenced on page 40 of the Comprehensive Plan.

will be for the merits of this case to determine the appropriate densities and layouts of development for the Heatherfields/Lot 108 development area.

Summary judgment is therefore granted to the City that § 15.18(A)(10) is sufficiently definite, as applied to the issue of the lot layout in the Heatherfields/Lot 108 development area, to be applied by the Court to the merits of this case. If any other elements of the goals and objectives of the Comprehensive Plan for the Southeast Quadrant are sought to be applied by the City to the merits of any of the four contested development areas, the constitutional vagueness analysis will have to be addressed, as applied, at that time.

### Motion to Strike

In Applicants' Reply to the City's Opposition to their Motion for Summary Judgment, Applicants also moved to strike the City's Supplemental Memorandum, filed with the Court on June 29, 2009, on the basis that it was filed ten days after the date granted by the Court as an extension of time. Applicants ask this Court to strike the City's memorandum, as well as the revised statement of undisputed material facts and the affidavit submitted in conjunction with the memorandum.

The Motion to Strike is denied as moot, as nothing in the City's supplemental memorandum or associated materials was determinative of any issues in the present motion. Rather, all the issues addressed in the memorandum relate to issues preserved for the merits: the correct methodology for density calculations under article 9 of the 2003 Regulations; whether eight units is an excessive number for the Clubhouse development area; what, if any, development is appropriate for areas designated as "restricted areas"; and whether any "scenic views" are implicated in any of the four contested development areas. Both parties will have ample opportunity to present evidence on any of these issues, as well as to present arguments on any of these issues remaining for the merits, if necessary, during trial or in their post-hearing memoranda.

Accordingly, based on the foregoing, it is hereby ORDERED and ADJUDGED that Applicant's Motion for Summary Judgment is GRANTED in part and DENIED in part, as follows:

- Summary judgment is granted to the City that § 15.18(A)(4) is sufficiently definite to be applied by the Court to the contested development areas with respect to the protection of wetlands and stream buffers; that §§ 15.18(A)(6) and (B)(4) regarding contiguity of open space are sufficiently definite to be applied by the Court to the contested development areas; that §§ 15.18(A)(5) regarding visual compatibility is sufficiently definite to be applied by the Court; and that § 15.18(A)(10) is sufficiently definite, as applied to the issue of the lot layout in the Heatherfields/Lot 108 development area, to be applied by the Court to the merits of this case.

- Summary judgment is granted to Applicants that §§ 15.18(B)(1) and (B)(3) are too vague to be applied by the Court to the contested development areas, and that § 15.18(A)(4) is too vague to be applied by the Court to the contested development areas with respect to the protection of unique natural features.

- Summary judgment is denied as to whether § 15.18(A)(4) is sufficiently definite to be applied by the Court to the contested development areas with respect to the protection of wildlife habitat, as material facts regarding the Open Space Strategy have not been provided to the Court.

- Summary judgment is denied as premature, as to whether § 15.18(A)(10) is otherwise sufficiently definite to be applied by the Court, and as to whether § 15.18(B)(2) is sufficiently definite to be applied by the Court, as that determination can only be made as applied to a particular issue raised

31

in this litigation.

Material facts remain in dispute as to whether, or how many of, the residential units proposed in the master plan for the four development areas contested in this appeal meet the applicable criteria remaining after this decision. A telephone conference has been scheduled (see enclosed notice) to discuss the scheduling of these remaining issues for trial, and whether the issues have been narrowed sufficiently to benefit from mediation prior to the scheduled trial dates.

Done at Berlin, Vermont, this 2nd day of February, 2010.

_____
Merideth Wright
Environmental Judge