2008 VT 100

### In re Pierce Subdivision Application (Robert Schumacher, Appellant)

[965 A.2d 468]

No. 07-121

Present: Reiber, C.J., Johnson, Skoglund and Burgess, JJ., and Kupersmith, D.J., Specially Assigned

Opinion Filed August 1, 2008

*Christina A. Jensen* of *Lisman, Webster & Leckerling, P.C.*, Burlington, for Appellant.

*David J. Shlansky* of *Shlansky & Co., LLP*, Vergennes, for Appellee.

¶ 1. **Burgess, J.** Neighbor appeals the Environmental Court's approval of applicant's proposed Planned Residential Development (PRD) adjoining his property in Ferrisburgh, Vermont. Under the Ferrisburgh Zoning Bylaws, a qualified PRD that proposes cluster housing and preservation of open space may be authorized by the Planning Commission by waiver of the standard rules governing single-house lot development. On appeal, neighbor claims that the court erred by concluding that: (1) the proposed subdivision meets the definition of a PRD as specified in the bylaws; (2) the project satisfies the space and density limitations under the bylaws; (3) the bylaws supply adequate standards to guide the court's discretion; and (4) the project complies with the minimum-lot-size requirements of the bylaws. We affirm the project's approval.[1]

¶ 2. Applicant proposed to subdivide a 113-acre portion of its property into a twenty-one lot PRD, with an additional lot reserved for common space. The bylaws define a PRD as "[a]n area of land to be developed as a single entity for a number of dwelling units, the plan for which does not conform to the zoning regulations." Zoning Bylaws for the Town of Ferrisburgh § 2.2 (as amended, March 6, 2001) [hereinafter Zoning Bylaws]. The sizes of the twenty-two lots range from under half an acre to 25.9 acres. These twenty-two lots are accessed by Pierce Woods Road,

---

[1] Because we affirm, we do not reach the issues raised in applicant's motion to conform the record and take judicial notice, received on the eve of oral argument.

a twenty-foot-wide roadway within a sixty-foot-wide access easement.

¶ 3. Applicant's 113-acre parcel has varied terrain containing woods, wetlands, Lewis Creek, a stream, and steep slopes. The proposal creates a fifty-foot buffer along Lewis Creek and the stream. Applicant proposes to conserve seventy-six percent of the land in the PRD as open space through perpetual easements once the PRD is approved.

¶ 4. The parcel encompasses three different zoning districts: Rural Residential (RR-2), Rural Agricultural (RA-5), and Conservation (Con-25). Each district has a minimum lot size: RR-2 requires two acres, RA-5 five acres, and Con-25 twenty-five acres. *Id.* §§ 4.2(D), 4.2(C), 4.3(C). Because zoning regulations for these districts would effectively prevent applicant from clustering houses on the parcel, applicant requested six waivers of the district zoning regulations to reduce the required minimum lot size and acreage per dwelling, along with frontage, width, depth, and setback requirements.

¶ 5. The Planning Commission approved the proposed PRD. Neighbor appealed that decision to the Environmental Court, complaining, in pertinent part, that the development's compliance with the bylaw definition of PRD could not be determined from applicant's plans, that the Commission improperly included the untraveled portion of the right-of-way as part of the lands subject to subdivision for purposes of calculating allowable density, that the bylaws delegated standardless discretion to the Commission to grant waivers of the district zoning regulations, and that the PRD failed to meet minimum lot size requirements. The Environmental Court rejected neighbor's arguments, affirming the approval of the application. This appeal followed.

I.

¶ 6. Neighbor first contends that the court's conclusion that the project satisfies the definition of a PRD rests upon an erroneous interpretation of Bylaw § 2.2, and, consequently, that the court's decision lacks necessary findings. Section 2.2 defines PRD as an "allowed method of land development" wherein the number of dwelling units "shall not exceed the number which *could be permitted* if the land were subdivided into lots in conformance with the zoning regulations." Zoning Bylaws § 2.2 (emphasis added). To determine whether the proposed PRD was consistent

with this definition, the court used a straightforward mathematical calculation — dividing total acreage of the parcel by minimum lot size as dictated by the three districts involved — to determine how many dwellings "could be permitted" under the bylaws.

¶ 7. Neighbor argues against this determination by simple long division, positing that slope, wetlands and stream characteristics of the parcel "potentially" limit the number of units available to a conforming subdivision, regardless of its aggregate acreage. Neighbor maintains that without a more detailed evaluation of the property vis-à-vis a conforming subdivision plan by which to determine the number of non-PRD units that could actually be built on the parcel, the court's conclusion of compliance with § 2.2 is unsupported by necessary findings. Neighbor characterized the § 2.2 definition as a "hurdle" arising at the outset of a PRD application, overcome only by the applicant engaging in a process before the Planning Commission to achieve approval for an identified number of units in a conventional subdivision plan.

¶ 8. We will uphold the Environmental Court's construction of a zoning ordinance "if it is rationally derived from a correct interpretation of the law and not clearly erroneous, arbitrary, or capricious." *In re Bennington Sch., Inc.*, 2004 VT 6, ¶ 11, 176 Vt. 584, 845 A.2d 332 (mem.). Our interpretation is generally bound by the plain meaning of the words in the ordinance, *In re Nott*, 174 Vt. 552, 553, 811 A.2d 210, 211 (2002) (mem.), unless the express language leads to an irrational result. See *State v. Forcier*, 162 Vt. 71, 75, 643 A.2d 1200, 1202 (1994) (recognizing that given a statute's express terms, we "[n]onetheless . . . avoid interpretations that would lead to an unjust, unreasonable and absurd consequence" (quotation omitted)).

¶ 9. Neighbor's construction of the bylaw is unreasonably burdensome and is not plainly mandated by the language. Since the density inquiry is triggered by an application for a PRD, rather than for a conforming development, the conforming subdivision contemplated by §§ 2.2 and 5.21(C)(2) can be only hypothetical. Nevertheless, neighbor reads both sections to require successive permit applications and proceedings, the first one for an imaginary development and the second one for the real proposal. If such a burden on the landowner was in place, we might question its reasonableness, *Forcier*, 162 Vt. at 75, 643 A.2d at 1202, but its drafters did not write the bylaw to require an applicant to obtain permission to build an unwanted subdivision in order to seek

approval for a PRD. As § 2.2 does not plainly intend dual applications, it could, as the Environmental Court reasoned, require only an estimate of allowable density, rather than mandating full scale submission of an unwanted conventional subdivision plan for approval as a precondition to applying for the intended PRD development. That would be if the definition controlled the application at all.

■ ¶ 10. It does not. Neighbor's reliance on § 2.2 — a definitional section — to mandate nondiscretionary determination of allowed density is misplaced. While § 2.2 generally describes a PRD as an authorized unconventional development that may not exceed the number of units allowed to a conventional subdivision, the actual determination of allowed units is explicitly vested to the discretion of the Planning Commission under § 5.21(C)(2). Section 5.21(C) sets forth the "General Standards for Review" of PRD proposals, including the condition that before approving a PRD application, the Environmental Court, acting in the Planning Commission's stead, must find that:

> The overall density of the project does not exceed the number of dwelling units which could be permitted, *in the Planning Commission's judgment*, if the land (excluding the area within the boundaries of any proposed road) were subdivided into lots in accordance with the district regulations and other relevant provisions of these bylaws.

Zoning Bylaws § 5.21(C)(2) (emphasis added). According to the plain language of the bylaw, § 2.2 summarizes what may qualify as a PRD, but § 5.21(C)(2) governs the actual determination of baseline density necessary for PRD approval.

¶ 11. Any hurdle to the applicant in this regard is specifically imposed by § 5.21(C)(2), and not by the § 2.2 definition. The density determination is left expressly a matter of "judgment," rather than a matter of such certainty as requiring the more exact finding following a fully documented hypothetical application like that envisioned by neighbor. The Environmental Court's finding as to the number of units allowed will not be disturbed "if it is rationally derived from a correct interpretation of the law and not clearly erroneous, arbitrary, or capricious." *Bennington Sch., Inc.*, 2004 VT 6, ¶ 11.

¶ 12. We disagree with neighbor that the court's summary calculation is insufficient for either the § 2.2 definition or the § 5.21(C)(2) compliance determination. The bylaws require the court to consider the number of units which, in its judgment, could be permitted under the regulations. The court did so and explained its rationale based on the undisputed estimates by applicant's engineer of the acreage in each of the districts involved by the project, as offered to prove that the PRD proposed no more lots than could be achieved by a conventional subdivision conforming to all applicable district regulations. The evidence supported this rationale, and the court's conclusion cannot be overcome by neighbor's speculation that the wetlands, slopes and stream within the parcel could, without more, "potentially" limit the number of units or lots that could have been approved for a conventional subdivision.

¶ 13. The court's use of a summary calculation to determine the number of units ordinarily permitted on the parcel was neither clearly erroneous nor whimsical. Absent a showing by neighbor that the calculation of permitted units must be incorrect, the court's arrival at its number using a general calculation based on the evidence is a reasonable exercise of its discretion. The Environmental Court's interpretation of both bylaws was reasonable, and its calculation was no abuse of discretion under either section.

## II.

¶ 14. Neighbor asserts that the court further erred in construing § 5.21(C)(2) to include only the travelled portion of the right-of-way as the "area within the boundaries of any proposed road" to be excluded from the acreage considered for density limits under the bylaw. Zoning Bylaw § 5.21(C)(2). The court excluded the twenty-foot wide strip of travelled roadway from its calculation of developable area, but not the entire sixty-foot-wide right-of-way. The bylaws do not define the term "road," so the court turned to the common understanding of the term to mean the visible and used portion of the roadway, rather than the full easement boundaries. The difference is crucial, as a calculation excluding the entire right-of-way, as proposed by neighbor, would result in the denial of the proposal.

¶ 15. We have not specifically addressed whether undeveloped sections of a right-of-way bordering a travelled portion of

blacktop are part of the "road" or are excluded from adjacent land, but we have held that a *"well-traveled roadway* cannot be considered part of a 'lot.' " *In re Bailey*, 2005 VT 38A, ¶ 12, 178 Vt. 614, 883 A.2d 765 (mem.) (emphasis added). The few Vermont cases dealing with the relationship between roadways and adjacent lots at first appear to also use the broader terms "right-of-way" and "easement" interchangeably. See, e.g., *id.* (explaining that this "Court viewed the right-of-way and the lot as separate physical entities and was unwilling to see a true right-of-way as part of a 'lot' "); *Wilcox v. Vill. of Manchester Zoning Bd. of Adjustment*, 159 Vt. 193, 197-98, 616 A.2d 1137, 1139-40 (1992) (equating "rights-of-way" with "easements," and considering how other jurisdictions dealt with a "right-of-way" relied upon by owner to achieve minimum lot size). However, whether called an easement, right-of-way, or road, we look to the actual "location and function" of the real way, rather than its most expansive, or formal, boundary in determining whether to treat the area as separate from a lot. *Bailey*, 2005 VT 38A, ¶ 11 (quotation omitted). As observed in *Wilcox*, "a right-of-way could be a well-travelled road, or simply lines on a plan that pose few practical barriers to the enjoyment of the property as a single parcel." 159 Vt. at 198, 616 A.2d at 1140.

¶ 16. Furthermore, we have explained that the mere width of the easement, rather than its actual travelled portion, did not "automatically" separate commonly owned adjoining land in *Wilcox*. *Id.* Land traversed by a brook, "although not easily developed, is included in the minimum lot size requirement" but "land under a road is already developed," and so cannot be included in the owner's lot size calculation. *Bailey*, 2005 VT 38A, ¶ 17; see also *Loveladies Prop. Owners Ass'n v. Barnegat City Serv. Co.*, 159 A.2d 417, 422 (N.J. Super. Ct. App. Div. 1960) ("[T]he determination . . . of which area is a lot and which a street . . . depends not on the way title is held, or platted areas apparently bounded on a filed map, but rather on the function which each separate area is to serve as observable by inspection of the plat.").

¶ 17. "Ordinarily when we review the environmental court's interpretation of a zoning ordinance, our review is deferential, and we accept the court's construction unless it is clearly erroneous, arbitrary, or capricious." *Bailey*, 2005 VT 38A, ¶ 9.

Absent a regulatory definition or apparent purpose to the contrary, the Environmental Court's interpretation of the word "road" to mean only the twenty-foot travelled portion of the easement was not inconsistent with the bylaw or at odds with our precedent. As noted by the court, if Ferrisburgh intended to exclude entire easements or rights-of-way from the calculation of lot area, instead of just the area within the boundaries of any proposed road, the bylaw could have said so. Moreover, the court was obligated to resolve ambiguity in the bylaw in favor of applicant. See *In re Vitale*, 151 Vt. 580, 584, 563 A.2d 613, 616 (1989) (reiterating that "it is a well-established rule in this state that in construing land use regulations any uncertainty must be decided in favor of the property owner"). Given the lack of regulatory definition, and the focus in *Bailey* and *Wilcox* on the actual functional area of the access easements, we cannot conclude that the court was clearly erroneous when it read the bylaws to implicate only the travelled portion of Pierce Woods Road, and allotted the open-space portion of the easement as part of the surrounding lots.

## III.

¶ 18. We now turn to neighbor's argument that §§ 5.21(C) and 5.21(D) fail to provide sufficient standards to guide the Environmental Court's exercise of discretion when evaluating the PRD. Neighbor contends that the bylaws are so vague that they do not inform applicants, courts or neighbors about what is permitted and what is prohibited. Neighbor further claims that adjoining landowners are denied due process and equal protection when challenging decisions of the Planning Commission because of the absence of standards upon which the court can review decisions.

¶ 19. In the context of land-use regulation, our approach to complaints of standardless, arbitrary discretion focuses on the criteria for due process and equal protection. See *In re Handy*, 171 Vt. 336, 345-46, 764 A.2d 1226, 1235-36 (2000) ("[T]he power to grant or refuse zoning permits without standards denies applicants equal protection of the laws; and . . . due process of law."); *In re Miserocchi*, 170 Vt. 320, 325, 749 A.2d 607, 611 (2000) ("such ad hoc decision-making denies . . . due process of law"); *Town of Westford v. Kilburn*, 131 Vt. 120, 124, 300 A.2d 523, 526 (1973)

(reasoning that absent standards, "the door is opened to the exercise of . . . discretion in an arbitrary or discriminatory fashion").

■ ¶ 20. Zoning ordinances must "provide . . . appropriate conditions and safeguards" to guide the decisionmaker. *Kilburn*, 131 Vt. at 124, 300 A.2d at 526 (quotation omitted). While we will invalidate ordinances that "fail[] to provide adequate guidance" and therefore lead to "unbridled discrimination," we will uphold standards even if they are general and will look to the entire ordinance, not just the challenged subsection, to determine the standard to be applied. *Id.* at 125, 300 A.2d at 526; see also *Handy*, 171 Vt. at 348-49, 764 A.2d at 1238 (citing *Vincent v. State Ret. Bd.*, 148 Vt. 531, 535, 536 A.2d 925, 928 (1987); *State v. Chambers*, 144 Vt. 234, 239, 477 A.2d 110, 113 (1984)).

■ ■ ¶ 21. Neighbor specifically contends that the bylaw provides no standards for the Planning Commission to approve or deny the six waivers requested by applicant as part of the PRD-approval process. While it is true that § 5.21 provides no concrete standards to consider each individual modification to the zoning regulations, neighbor's argument misunderstands the nature of a PRD. The Legislature authorized PRDs to "encourage flexibility of design and development of land in such a manner as to promote the most appropriate use of land, . . . and to preserve the natural and scenic qualities of the open lands of this state." 24 V.S.A. § 4407(3) (repealed 2004).[2] In order to achieve these goals, particularly the encouragement of flexible planning, "[t]he modification of zoning regulations by the planning commission . . . may be permitted simultaneously with approval of a subdivision plan." *Id.* Such modifications, or "waivers," are part of the process of approving a PRD — a type of concentrated housing development permitted in exchange for open space which, by its very nature, does not fit the traditional zoning scheme. The consideration of these waivers, therefore, is folded into the Commission's analysis of the PRD itself. The proper inquiry is thus whether the bylaw provides the Commission with sufficient overall standards to grant a PRD permit, and whether the waivers granted comply with these standards.

---

[2] Though now repealed, § 4407(3) still applies to town ordinances written under this section until September 1, 2011. 24 V.S.A. § 4481.

¶ 22. Subsections (C) and (D) provide standards to guide the Commission's approval of a PRD. Some of the standards in subsection (C) are general:

1. The PRD is consistent with the municipal plan.

. . . .

4. The PRD is an effective and unified treatment of the development possibilities of the site and the development plan makes appropriate provision for preservation of streams, and stream banks, steep slopes, wet areas and unique natural and manmade features.

5. The development plan is proposed over a reasonable period of time in order that adequate municipal facilities and services may be provided.

. . . .

8. Any open space land will be evaluated as to its agricultural, forestry and ecological quality.

Zoning Bylaw § 5.21(C). By their terms, these tend to be overall objectives and recommendations, rather than specific standards to be measured and met.

¶ 23. Other provisions of § 5.21(C) and (D), however, contain more specific standards for the approval of a PRD. Section 5.21(C) requires that:

2. The overall density of the project does not exceed the number of dwelling units which could be permitted, in the Planning Commission's judgment, if the land (excluding the area within the boundaries of any proposed road) were subdivided into lots in accordance with the district regulations and other relevant provisions of these bylaws.

3. The uses proposed for the project are residential; dwelling units may be of varied types, including one-family, two-family or multifamily construction.

. . . .

7. Any modification of the zoning regulations approved under this section shall be specifically set forth in terms of standards and criteria for the design, bulk and spacing

of buildings and the sizes of lots and open spaces which shall be noted on or appended to the application.

*Id.* § 5.21(C). In addition, § 5.21(D) requires that:

1. District regulations on height and spacing between main buildings shall be met.

2. To ensure adequate privacy for existing or proposed uses adjacent to the PRD, structures on the perimeter of the PRD shall be set back 50 feet and screening may be required.

3. Adequate water supply and sewage disposal facilities shall be provided.

4. Each dwelling unit shall have a minimum two acre lot exclusively associated with it and must comply with the specific standards set forth in Section 4.1 and 4.2 of these bylaws, excluding the lot depth requirement.

5. The minimum acreage for a PRD shall be 25 acres and a minimum of 60% of the total parcel shall remain undeveloped.

*Id.* § 5.21(D).

¶ 24. Thus, while some of the bylaws' objectives are general, other provisions impose specific limits to guide and check the Commission's discretion. These requirements provide restrictions on the type of units which may be allowed, the percentage of open space required in a PRD, and the timing and form of applications. As stated in *Handy,* we consider the entire ordinance when evaluating whether it provides sufficient guidance to a decision-making body. 171 Vt. at 348-49, 764 A.2d at 1238. By providing both general and specific standards for PRD review, the bylaw strikes an appropriate balance between providing guidance to the Commission and avoiding inflexible requirements which would defeat the creativity and flexibility required to effectuate the goals of the PRD alternative to traditional development. The list of particular requirements set forth in § 5.21(C) and (D) provides sufficient standards for the Commission, and for the court upon review, to evaluate a proposed project's compliance with the bylaws while avoiding, as the Environmental Court put it, the "inflexibility that *Kilburn* and *Handy* cautioned about."

■■ ¶ 25. All six waivers approved as part of the application — lot-size and acreage-per-dwelling minimums, lot frontage, width, and depth requirements, and setback rules — comply with the standards listed in § 5.21(C) and (D). In accordance with § 5.21(C)(7), the waivers were specific, establishing alternative "standards and criteria" for lot sizes, frontage, width, and depth requirements, and setbacks for the units in the PRD.[3] The requested setback waivers did not violate § 5.21(D)(2)'s requirement that structures be set back fifty feet from the perimeter of the PRD. The waivers to minimum-lot-size and acreage-per-dwelling requirements enabled applicant to cluster dwellings in the PRD while also complying with the requirements that "[e]ach dwelling unit [] have a minimum two acre lot exclusively associated with it," *id.* § 5.21(D)(4), and that the "overall density of the project [] not exceed the number of dwelling units which could be permitted . . . if the land . . . were subdivided . . . in accordance with the district regulations," *id.* § 5.21(C)(2). The lot frontage, width, and depth waivers were similarly in accordance with the standards established by § 5.21(C) and (D). These waivers enabled the flexibility of design needed for the construction of a PRD, yet complied in full with the specific requirements established in § 5.21(C) and (D). As such, we affirm the court's approval of these waivers.

## IV.

¶ 26. Neighbor's final argument is that the court erred in concluding that the project complied with § 5.21(D)(4), which requires that:

> Each dwelling unit shall have a minimum two acre lot exclusively associated with it and must comply with the specific standards set forth in Section 4.1 and 4.2 of these Bylaws, excluding the lot depth requirement.

*Id.* § 5.21(D)(4). Sections 4.1 and 4.2, respectively, specify dimensional standards in the RR-2 and RA-5 districts for maximum

---

[3] Specifically, applicant requested reductions to requirements for (1) minimum lot size to one-third of an acre; (2) minimum acreage per dwelling to one-third of an acre, provided that this reduction did not affect the total number of units allowed; (3) the lot frontage and width minimums to sixty feet; (4) the lot depth requirement to one hundred and twenty-five feet; (5) front yard setback minimum to fifty-five feet; and (6) rear and sideyard setbacks to fifteen feet.

height and lot coverage, together with minimum lot frontage, width, setbacks and lot size. Neighbor is particularly concerned with the subsection's declared minimum lot size and minimum acreage for each dwelling unit of two acres in RR-2, and five acres in RA-5. *Id.* §§ 4.1(D)(1) and (2), 4.2(C)(1) and (2). Many of the unit lots approved by the Commission were significantly smaller than the two and five acres ostensibly required by the bylaws.

¶ 27. The Environmental Court declined to construe the section to require the units themselves to be located on two- and five-acre lots. Instead, the court read the rule to command that there had to be at least the specified number of acres, within the particular district at large, corresponding to each proposed unit in that district. Otherwise, reasoned the court, two- and five-acre building lots would defeat the entire purpose of the PRD, which is to promote cluster housing and open land. Neighbor contends that the court's interpretation was contrary to the plain meaning of the bylaw imposing minimum house-lot areas.

¶ 28. As discussed above, we ordinarily read bylaws according to their plain language, "giving effect to the whole and every part of the ordinance." *In re Stowe Club Highlands*, 164 Vt. 272, 279, 668 A.2d 1271, 1276 (1995). The overarching objective of the Court in matters of statutory construction, however, "is to give effect to the legislative intent." *Lubinsky v. Fair Haven Zoning Bd.*, 148 Vt. 47, 49, 527 A.2d 227, 228 (1986); see also *In re Vt. Nat'l Bank*, 157 Vt. 306, 312, 597 A.2d 317, 320 (1991) ("In construing a zoning ordinance, we use the same rules as in the construction of a statute."). This paramount "concern is so fundamental that, although application according to the plain language is preferred when possible, the letter of a statute or its literal sense must yield where it conflicts with legislative purpose." *Lubinsky*, 148 Vt. at 49, 527 A.2d at 228.

¶ 29. Here, § 5.21(D)(4)'s reference to the district zoning requirements established by §§ 4.1 and 4.2 would appear to require compliance with conventional zoning lot size, but the definition of PRD along with the balance of § 5.21, including the introductory language of subsection (D)(4), indicates the opposite. Section 2.2 defines a PRD as a plan that "does *not* correspond . . . to the zoning regulations established for the district," while § 5.21 establishes standards for evaluating whether the proposed non-

conformity is acceptable enough for the Planning Commission to modify the district's zoning rules *"simultaneously* with approval of a site plan." Zoning Bylaws §§ 2.2, 5.21 (emphasis added). The mandate of § 5.21(D)(4), that "[e]ach dwelling unit shall have a minimum two acre lot exclusively associated with it," would be unnecessary if § 4.1 was still to require a minimum unit lot of two acres in RR-2 and similarly irrelevant if companion § 4.2 independently required locating units on five acre lots in RA-5. Reading the bylaws to require units to sit upon two- or five-acre lots would confound the primary objective of the PRD authorization to allow cluster housing and would contradict the bylaws' allowance of clustered units so long as there are at least two acres of land specifically "associated" with each unit in the project as a whole.

¶ 30. Neighbor's insistence on a literal construction would frustrate the purpose of the PRD ordinance by outlawing the trade-off of housing clustered on undersized lots in exchange for preservation of large tracts of open lands and forests. If each unit in the PRD had to be situated on a lot of not less than two or five acres to meet the size mandates of §§ 4.1 and 4.2 as purportedly required by § 5.21(D)(4), a PRD in Ferrisburgh would be no different than a conventional subdivision consuming all of the land in sprawling house lots. The Environmental Court correctly recognized that such an application of the regulation would render the PRD bylaw self-defeating. Instead, the court construed § 5.21(D)(4) compatibly with the express goal described in § 2.2 of promoting clustered units in return for open space, and the § 5.21(D)(4) mechanism consistent with achieving that objective: the requirement that each unit have not less than two acres "exclusively associated with it" within the development at large. *Id.* § 5.21(D)(4). Considering plain-language conflicts within legislation, we have observed that "though such construction may seem contrary to the letter of the statute[, w]hen the provisions of a law are inconsistent, effect must be given to those which harmonize with the context and the apparent intent of the Legislature." *State v. Estate of Taranovich*, 116 Vt. 1, 5, 68 A.2d 796, 798 (1949). The Environmental Court's reconciliation of the ordinance provisions was neither patently wrong nor unreasonable. See *In re Casella Waste Mgmt., Inc.*, 2003 VT 49, ¶ 6, 175 Vt. 335, 830 A.2d 60 (noting that "[w]e review the environmental court's construction

of a zoning ordinance to determine whether the interpretation is clearly erroneous, arbitrary or capricious.").

*Affirmed.*