## STATE OF VERMONT

## SUPERIOR COURT — ENVIRONMENTAL DIVISION

| | |
|---|---|
| In re SP Land Co., LLC Golf Course PUD | } } } } } } } } } |
| (Appeal from Killington Planning Commission determination) | Docket No. 74-5-10 Vtec |

### Decision on Cross-Motions for Summary Judgment

Appellant Stephen Durkee ("Appellant") appeals to this Court a decision by the Town of Killington ("Town") Planning Commission ("Commission") granting what the Commission characterizes as "conceptual Master Plan Approval, with partial affirmative findings" under the Town's Planned Unit Development ("PUD") criteria for a proposed residential and commercial development on 229± acres in the Killington Basin Section of the Ski Village Zoning District of the Town. The application presents a conceptual overview of the future development of up to 328 independently occupied residential dwelling units and 32,600 square feet of commercial and club facilities on land within and adjacent to the existing Killington Resort Golf Course.

Applicant SP Land Company, LLC ("Applicant") is represented in these proceedings by co-counsel Timothy M. Eustace, Esq. and Heather R. Hammond, Esq. Appellant is represented by Daniel C. Hershenson, Esq. The Town, an interested person in this appeal, is represented by James F. Carroll, Esq. Interested persons Trial Creek Condominium Homeowners Association, Inc. and Pinnacle Condominium Association, Inc. are both represented by Theodore F. Robare, Esq., and interested person Mountain Green Condominium Association, Inc. is represented by Christopher J. Larson, Esq.

Pending before the Court are cross-motions for summary judgment filed by Applicant, Appellant, and the Town. Each of these parties has filed for favorable judgment on all twelve Questions posed in Appellant's Statement of Questions, and Applicant has additionally filed a motion seeking judgment in its favor

1

contending that Appellant lacks standing to prosecute this appeal. None of the remaining parties has filed a response to the pending motions.

## Factual Background

For the sole purpose of putting the pending motions into context, we recite the following facts, which we understand to be undisputed unless otherwise noted:

1. In 1980, a predecessor in title to the applicant now before us, then known as the Sherburne Corporation, owned an approximately 400-acre area which today constitutes the entirety of the Killington Basin Section of the Ski Village Zoning District ("SVD District") in the Town.

2. In 1980, the Sherburne Corporation submitted to the Commission a development plan for the 400-acre parcel, seeking review and approval under the PUD criteria in the Town of Killington, Vermont Zoning Regulations ("Regulations"). Because of the magnitude and multiple components of the proposed development, the then applicant and Town planning officials apparently determined to begin a process of first reviewing the overall development plan on a conceptual basis.[1] After deliberations the Commission granted conceptual master plan approval on July 1, 1980 for the Sherburne Corporation's proposed development within the 400-acre area.[2]

3. The procedure apparently agreed upon between the Town and the Sherburne Corporation that began in 1980 provided that approval of a conceptual master plan for the 400-acre Killington Basin Section would be effective for four years and that no actual development would occur until individual development projects contemplated by the conceptual master plan underwent site plan review.

---

[1] The Killington Ski Resort pre-existed Sherburne Corporation's 1980 proposed master plan; its 1980 master plan proposed to expand and improve the facilities and development that already existed near the base of the Killington Ski Resort.

[2] The unapproved minutes of the July 1, 1980 meeting in which the Commission appears to have granted approval state the following: "CONCLUSION: [PUD] approval be granted for the Sherburne Corporation for the so-called '400 acre' ski village . . . ." (See Horner Aff. ¶ 6(m), Ex. 13, filed Oct. 8, 2010.) The Town and Applicant provided a copy of the July 1, 1980 Commission minutes as Exhibit 13 to the Affidavit of Richard Horner, Killington Town Planner and Zoning Administrator.

4. Between 1980 and 2004, the Commission reviewed and approved applications for updates to the approved 1980 conceptual master plan, as well as for individual development projects planned within the 400-acre parcel.[3]

5. At no time prior to or since the first approval in 1980 of a conceptual master plan for the 400-acre Killington Basin Section has the Town adopted specific procedures or standards within its land use regulations for conceptual master plan approval. The terms "conceptual" and "master plan" do not appear in any applicable Town regulations.

6. On January 18, 2010, the current Applicant submitted to the Commission a document titled "Application for Planned Unit Development Review & Master Plan Approval: Golf Course PUD for the Ski Village District – Killington Basin Section." (See Applicant's Mot. for Summ. J., Ex. 1, filed Oct. 8, 2010.) By this submission, Applicant sought review of a proposal to develop property within a 229± acre portion of the 400-acre Killington Basin Section of the SVD District. Applicant identified this portion as the Golf Course PUD and suggested that the development would include up to 328 independently occupied residential dwelling units and 32,600 square feet of commercial and club facilities. The existing Killington Resort Golf Course is located within this 229± acres; the proposed development is identified on Maps 1–8 that are attached to Applicant's application.

7. The 229± acres on which Applicant proposes new development are currently owned by entities affiliated with Applicant: MTB Killington, LLC; AMSC Killington, LLC; and SP II Resort LLC; these latter entities hold title to the subject acreage as tenants in common.

8. Some time after receiving Applicant's submission, the Commission issued a document entitled "Killington Planning Commission Findings of Fact, Conclusions of Law and Order Re: Golf Course Planned United Development and Master Plan Review within the Ski Village District Killington Basin Section under Section 505 of the Town of Killington Zoning Regulations." The document states that the

---

[3] The Town, Applicant, and Appellant disagree about the extent to which the Commission, between 1980 and today, has issued conceptual master plan approvals, as compared to full PUD approvals, for areas within the 400-acre Killington Basin Section. (See Joint Statement of Undisputed Facts of Applicant and Town ¶¶ 1, 3–4, filed Oct. 8, 2010; Stearns Aff. ¶ 10, filed Dec. 1, 2010 (Affidavit of Attorney David Stearns detailing the result of his search through the Town Planning Commission records since 1980).)

"Commission grants conceptual Master Plan Approval, with partial affirmative findings under the PUD criteria set forth in [Regulations] Section 505 for the Golf Course PUD." The document is signed by five Commission members with signatures dated April 7, 2010.[4]

9. On May 10, 2010, Appellant filed a timely appeal with this Court.[5]

## Discussion

This de novo appeal arises from the Commission's issuance of its April 7, 2010 Findings of Fact, Conclusions of Law and Order ("Commission Order")[6] granting Applicant "conceptual Master Plan Approval" and "partial affirmative findings" for its proposed residential and commercial development on property within a 229± acre area containing the existing Killington Resort Golf Course. Applicant collectively refers to the 229± acres as the Golf Course PUD and has proposed what it characterizes as a conceptual master plan for the future construction of substantial and multifaceted developments that would include up to 328 independently occupied residential dwelling units and 32,600 square feet of commercial and club facilities. Applicant has sought review and approval of its proposal under the PUD criteria listed in Regulations § 505.

Appellant's twelve Questions in his Statement of Questions raise three principal issues: (1) whether the Commission has authority to issue "conceptual Master Plan Approval" for the Golf Course PUD proposal submitted by Applicant; (2) whether the Town's Regulations addressing PUD approval comply with the state statutory provisions governing municipal land use planning and development; and (3) if so, whether Applicant's proposal complies with the requirements of the Regulations. (See Statement of Questions, filed May 24, 2010.)

Currently pending before the Court are cross-motions for summary judgment filed by Applicant, Appellant, and the Town. These motions address all

---

[4] The Court erroneously referred to the date on this document as June 16, 2010 in its November 30, 2010 Entry Order issued in connection with this appeal. June 16 is the date the document was filed with the Court, but the order was signed by Commission members on April 7, 2010.

[5] Friday, May 7, 2010, would have been the last day to file a timely appeal. However, since all Vermont courts were closed that day, due to a furlough imposed for budgetary purposes, Appellant's filing on the next business day (Monday, May 10, 2010) was deemed timely.

[6] A copy of the Commission Order is attached as Exhibit C to the parties' joint Stipulated Statement of Undisputed Facts.

twelve legal issues raised in Appellant's Statement of Questions, summarized above. Applicant also challenges Appellant's standing as an "interested person" in these proceedings, and both Applicant and the Town raise the argument that there is no appealable decision before the Court. We first address the latter two arguments, since a determination that Appellant lacks standing, or that the Commission Order is not appealable, would render moot the substantive legal questions raised by Appellant in his Statement of Questions.

Before the Court can issue summary judgment in favor of any one of the moving parties on any of the above issues, it must examine the record before it and conclude both "that there is no genuine issue as to any material fact" and that one or more of the parties "is entitled to judgment as a matter of law." V.R.C.P. 56(c)(3). A court can issue summary judgment against a moving party when there are no disputed material facts and the non-moving party is entitled to favorable judgment. See V.R.C.P. 56(c)(3) ("Summary judgment when appropriate may be rendered against the moving party"); In re Hildebrand, 2007 VT 5, ¶¶ 8–9, 181 Vt. 568 (mem.).

Additionally, when considering cross-motions for summary judgment, the Court must give each party "the benefit of all reasonable doubts and inferences when the opposing party's motion is being judged." City of Burlington v. Fairpoint Commc'ns, 2009 VT 59, ¶ 5, 186 Vt. 332 (citing Toys, Inc. v. F.M. Burlington Co., 155 Vt. 44, 48 (1990)). A Court determination that either there is a genuine dispute as to a material fact, or that the applicable law does not entitle any party to judgment as a matter of law, requires that the pending motions be denied and the case proceeds to trial. We address the parties' motions with these standards in mind.

## I.    **Appellant's Standing**

Applicant has submitted two motions for summary judgment. In its first motion (filed on August 20, 2010), Applicant argues that Appellant has no standing to bring the present appeal because he does not qualify as an "interested person" under the requirements in 24 V.S.A. § 4465(b). While Applicant and Appellant assert slightly different facts in relation to whether Appellant has standing, there are no material facts in dispute preventing us from rendering a

determination on Appellant's standing at the summary judgment stage. For the reasons detailed below, we conclude that Appellant has standing as an interested person in these proceedings.

Section 4465(b) lists alternative classifications under which a party can qualify as an "interested person" and, via the provisions in 24 V.S.A. § 4471, be entitled to appeal a decision of an appropriate municipal land use panel. The Commission is such a panel. 24 V.S.A. § 4303(3). Appellant responds that he is able to meet the three requirements for classification as an interested person under § 4465(b)(3): "owning or occupying property in the immediate neighborhood" of the property subject to the municipal decision, "demonstrat[ing] a physical or environmental impact on [his] interest under the criteria reviewed," and "alleg[ing] that the decision . . . if confirmed, will not be in accord with the policies, purposes, or terms of the" applicable municipal plan or regulations.

The parties debate whether Appellant owns or occupies property in the same neighborhood as that which Applicant proposes to develop. Appellant represents that he owns three commercial and rental properties that are approximately a half-mile "as the crow flies" from the Golf Course PUD and that the proposed development will be visible from one of these properties. He also represents that the proposed development, particularly because it is significant, will increase the traffic on the main road that joins his properties to the proposed development; that the neighborhood surrounding Applicant's proposed development and his own properties is one neighborhood focused principally on the ski resort; and that the increased traffic will impact his use of his properties. Applicant argues, to the contrary, that the driving distance between Appellant's properties and the areas proposed for development within the Golf Course PUD is considerable, 1.6 or more miles; that there is little or no visibility between the two sets of properties; and that dense development separates them.

Even when viewing the facts in a light most favorable to Applicant we conclude that, given the significance of Applicant's proposed development, the uniformity of the neighborhood surrounding the two sets of properties, and the close proximity of the properties, Appellant does "own[] or occupy[] property in the immediate neighborhood" of the proposed development, thereby satisfying the first

6

requirement of § 4303(3).  Cf. In re Kaminksy House Replacement Application, No. 269-11-06 Vtec, slip op. at 8 (Vt. Envtl. Ct. Mar. 28, 2007) (Wright, J.) (concluding that an appellant met the requirements of § 4465(b)(3) partially because of the significant size and design of the proposed project and despite the lack of visibility between the appellant's property and the project); Bostwick Road Two-Lot Subdivision, No. 211-10-05 Vtec, slip op. at 4–5 (Vt. Envtl. Ct. Feb. 24, 2006) (Durkin, J.), aff'd, No. 2006-128 (Vt. Jan. 2007) (unpublished mem.) (concluding that an appellant did not have standing under § 4465(b)(3) partially because the appellant's residential property was distinct in character and geographically separated from the tourist-oriented area where the proposed development, a vineyard, was to be located and because the appellant did not convince the Court the proposed vineyard would create enough traffic to affect the appellant).

Having found that Appellant meets the first requirement under § 4465(b)(3), and because no party debates that Appellant meets the third statutory requirement,[7] whether Appellant has standing turns, ultimately, on whether he can "demonstrate a physical or environmental impact on [his] interest under the criteria reviewed."  Whether Appellant's interest can be said to be impacted by the Commission Order depends on the character of the Commission's determination and on an analysis of whether the Commission's affirmative findings and conclusions of law create an "injury in fact to a protected legal interest or the threat of an injury in fact" to Appellant.[8]  In re Boocock, 150 Vt. 422, 424 (1988); see Riverview Mews, LLC v. Richard Electric, No. 215-11-07 Vtec, slip op. at 5 (Vt. Envtl. Ct. Apr. 7, 2008) (Wright, J.) (discussing § 4465(b)(3)'s incorporation of the requirements for standing in civil cases and comparing the injury-in-fact requirement with the discussion of impact in § 4465(b)(3)).  To determine what impact, if any, could be suffered by Appellant, we review the specific components of the Commission Order: its affirmative findings and conclusions of law.

In their motions for summary judgment, both Applicant and the Town argue that the Commission's affirmative findings and conclusions of law are not final and

---

[7] Appellant's Statement of Questions alleges that the Commission Order violates the Town's Regulations or is ultra vires.

[8] In an Entry Order of November 30, 2010 the Court provided all parties the opportunity to provide supplemental memoranda discussing the character of the Commission Order.

that those appealed by Appellant do not have ramifications that could injure Appellant. While we find this argument compelling, it is contradicted by the very text and title of Applicant's application and the Commission Order. Applicant presented an application that details how its proposed development complies with the Town's PUD criteria and, by its title, sought "Planned Unit Development Review & Master Plan Approval." (See Stipulated Statement of Undisputed Facts, Ex. A at 1, 3–8, filed Aug. 23, 2010.) The Commission, in its decision partially titled "Findings of Fact, Conclusions of Law and Order," granted Applicant's request for partial affirmative findings and legal conclusions under some, although not all, of the criteria governing PUD approval. See Commission Order 16, ¶ 11. These factual findings and legal conclusions include determinations, appealed by Appellant, that Applicant's application and various components of the proposed Golf Course PUD conform to some of the regulatory requirements for site plan submission, provision of privacy for residents, roadways and parking, water and sewer facilities, inventory and preservation of unique natural features, and landscaping and screening. See id. 14–16, ¶¶ B(1)–(11); (Statement of Questions). While these findings do not complete the municipal review of Applicant's master plan or individual development projects, they constitute a global approval to the conceptual master plan and material affirmative findings under many substantive provisions for PUD approval.

While the Commission Order states that some of the appealed affirmative findings and legal conclusions are subject to further review, we conclude that the determinations rendered by the Commission create enough finality to pose a threat of injury or impact to Appellant and to his use of his nearby properties, particularly in regard to aesthetics and increases in traffic. We reach this conclusion even when viewing the facts in a light most favorable to Applicant. Thus, we conclude that Appellant has standing to prosecute this appeal, and we **DENY** Applicant's motion for summary judgment on standing.

## II.    **Appealability of the Commission Order**

Both the Town and Applicant also assert that there is no decision here for Appellant to appeal because the Commission's review was conceptual, does not permit any development or construction, and does not contain factual findings or

8

legal conclusions that prejudice Appellant.  Specifically, the Town claims that the Commission Order is not a final administrative decision and thus not subject to appeal under 24 V.S.A. § 4471 and 3 V.S.A. § 815, a provision of the Vermont Administrative Procedures Act ("APA") allowing appeal of "final decision[s]."[9]  The Town supports its argument with reference to the following language from the Commission Order: "This conceptual Master Plan approval, including all findings and conclusions contained herein, does not preclude or prejudice any interested parties from raising issues of fact or concerns about specific impacts related to the subsequent PUD and/or Site Plan Review applications for development within the Golf Course PUD."  Commission Order 16, ¶ E.

To determine whether the Commission Order is an appealable decision, we turn first to the statute granting a right of appeal from municipal panel decisions and then to the structure and content of the Commission Order itself.  When interpreting statutes, our goal must be to give effect to the intent of the Legislature.  See Town of Killington v. State, 172 Vt. 182, 188 (2001).  A search for intent begins with the statute's plain language, and we are directed to turn to other methods of determining legislative intent only after concluding that the ordinary meaning of the statutory language makes the statute ineffective or leads to irrational results.  Id. at 189.

Section 4471 of Title 24 states that parties who can show they meet the standing and participation requirements[10] codified in 24 V.S.A. § 4465 and § 4471(a) are granted the right to appeal "a decision rendered in [a municipal regulatory proceeding authorized under Title 24] by an appropriate municipal

_____

[9] In municipal land use appeals, the question of finality arises most commonly not as it does here but rather in the context of whether a municipal decision includes any determinations that are final such that they become binding when the decision is not appealed.  See 24 V.S.A. § 4472(d) (stating that failure to timely appeal a municipal body's decision will render that decision binding).  In In re Simpson Development Corporation (Appeal of Preliminary Plat and PRD Determinations), for instance, this Court examined individual determinations made during a municipality's preliminary review of a subdivision plan, asking whether appellants could challenge these determinations after a subsequent final review.  No. 54-3-05 Vtec, slip op. at 1, 3–4, 13–14 (Vt. Envtl. Ct. June 27, 2006) (Durkin, J.) (concluding that one of the determinations made in the preliminary review decision was final and thus had to be appealed at the preliminary review stage to avoid its becoming binding); see also Perras & Sons, Inc. Preliminary Plat, No. 29-2-06, slip op. at 8 (Vt. Envtl. Ct. Oct. 18, 2006) (Durkin, J.) (concluding that one of the determinations made during review of a subdivision sketch plan prior to preliminary review was final if not appealed).

[10] No party disputes that Appellant meets the participation requirements in 24 V.S.A. § 4471.

panel to the environmental division." 24 V.S.A. § 4471. In In re Appeal of Miller, our Supreme Court interpreted similar language in the former § 4471, allowing appeal from "a decision of a board of adjustment or a development review board to the environmental court," to authorize appeal "for any 'decision of the board of adjustment,' . . . not only for decisions granting or denying permits." 170 Vt. 64, 76 n.5 (1999) (emphasis added); see also In re Carroll, 2007 VT 19, ¶¶ 13, 16, 181 Vt. 383. Applying this precedent, we conclude that the pending appeal is not premature simply because the Commission Order is not the final decision necessary before construction of the proposed development can occur.

The Town also argues that this appeal is prohibited by the limit imposed upon appeals of administrative decisions under the APA; that is, only a "final decision" is subject to appeal under the APA. See 3 V.S.A. § 815. In support, the Town points to language in § 4471(a) stating that appeals from municipal panels "shall be taken in such manner as the supreme court may by rule provide for appeals of state agencies" under the APA. However, the Town provides no convincing authority to support the conclusion that the APA applies here in such a manner as to restrict a party's right to appeal only "final" land use determinations.[11] Section 4471 does not have such restrictive language; it in fact has the broader phrase of "a decision."

Although "a decision" is not defined by the Vermont Planning and Development Act, 24 V.S.A. §§ 4301–4498, we find no authority for limiting the interpretation of an appealable decision to only those that render the final approval for a development project; we conclude that the ordinary meaning of this statutory term ("a decision"), particularly in the context of municipal land use panel determinations, must include the type of formal written determination that is now before this Court. The Commission Order includes signatures of Commission members dated April 7, 2010 and sections with the following official headings: "Findings of Fact," "Conclusions of Law," and "Order." Commission

---

[11] Indeed, one of the cases cited by the Town is In re Maple Tree Place, in which our Supreme Court stated the Vermont "APA does not apply to local boards or commissions" and determined that the provisions of the Vermont APA are not incorporated into appeals of municipal bodies simply by § 4471's general reference to procedural rules relating to them. 156 Vt. 494, 497–98 (1991).

Order 3, 12, 14.  Additionally, the document grants Applicant substantive legal entitlements.  While the Commission makes it explicit that it is not granting what it calls "final PUD approval," and that Applicant must submit additional applications and receive approvals before it can begin any new construction within the Golf Course PUD, the Commission describes Applicant's proposal as follows:

> The Applicant is seeking approval of the conceptual master plan for the Golf Course PUD.  In addition, the Applicant is seeking partial findings under the PUD criteria in Section 505 of the [Regulations], in order to gain affirmative entitlements that will enable an applicant to proceed with certainty to PUD and/or Site Plan Review . . . and which conditions would apply to subsequent PUD and/or Site Plan Review for phases of the Golf Course PUD development."

Commission Order 2 (emphasis added).

The document states that "the Commission hereby issues its Findings of Fact, Conclusions of Law and Order under [§ 505] for conceptual master plan approval and partial affirmative findings under the PUD criteria" and then proceeds into Findings of Fact addressing the compliance of Applicant's proposal with each of the criteria in Regulations § 505.  Id. 3–11.  The document concludes with an Order section, whereby the Commission "grants a four year PUD approval expiring April 7, 2014 for the Master Plan and these partial affirmative findings as to some of the PUD criteria."  Id. 15, ¶ B(6).

Based on the structure and content of the Commission Order, it appears beyond dispute to this Court that it is an appealable decision.  Whether the Commission Order was rendered in a proceeding authorized by the statute is discussed in more detail below, in Section III, but that analysis does not affect the act of the Commission in rendering factual findings, legal conclusions, and an order; such actions constitute a decision.

In addition to the Town's argument that the Commission Order is not a final decision and therefore not appealable, Applicant supplements the Town's argument by contending that Appellant's appeal is not ripe for review because the Commission did not render affirmative findings and legal conclusions addressing the entirely of each PUD criteria.  But § 4471 is not as limiting as Applicant suggests, and the very language of the Commission Order contradicts Applicant's argument that no substantive findings or conclusions have been rendered.

11

For all these reasons, we conclude that Appellant is authorized to appeal the Commission Order and present his challenges to the factual findings, legal conclusions, and order expressed in that decision. We **DENY** the Town and Applicant summary judgment to the extent they have sought dismissal of this appeal for non-finality of the Commission Order.

### III.  Commission's Authority to Issue Conceptual PUD Master Plan Approval

Having determined that the Commission Order is an appealable decision that could impact or injure Appellant, we turn now to the substantive legal issues raised in this appeal. The primary legal issue of whether the Commission had authority to issue its Order is one on which the Town, Applicant, and Appellant seek summary judgment.[12] We find that there are no material facts in dispute regarding this issue and, as discussed below, our analysis reveals that there is presently no authorizing language in the relevant municipal regulations giving the Commission authority to issue conceptual master plan approval for a PUD.

The Vermont legislature has adopted the "Dillon's rule" scheme for the grant of municipal authority; that is, municipalities in Vermont have "only those powers and functions specifically authorized by the legislature, and such additional functions as may be incident, subordinate or necessary to the exercise thereof." In re Petition of Ball Mountain Dam Hydroelectric Project, 154 Vt. 189, 192 (1990) (quoting Hinesburg Sand & Gravel Co. v. Town of Hinesburg, 135 Vt. 484, 486 (1977)). Our Supreme Court has stated that if there is "any fair, reasonable, substantial doubt" concerning whether authority in the municipality exists, the question must be resolved in the negative. Id. at 192 (quoting Valcour v. Vill. of Morrisville, 104 Vt. 119, 130 (1932)). Additionally, any municipal regulation adopted pursuant to a statutory grant of power must, in order to be constitutional, include specific standards that prevent the delegation of "standardless discretion" to a municipal panel. In re Appeal of JAM Golf, LLC, 2008 VT 110, ¶ 17, 185 Vt. 201 (citing In re Handy, 171 Vt. 336, 348–49 (2000)).

---

[12] The question of whether the Commission has such authority is preserved for our review by Appellant in Questions 1–3, 11, and 12 of his Statement of Questions. (See Statement of Questions ¶¶ 1–3, 11–12, filed May 24, 2010.)

In its motion for summary judgment, the Town argues that the Commission has authority to review the conceptual master plan submitted by Applicant and issue a decision granting approval of such plan under 24 V.S.A. § 4417, which allows and establishes the minimum provisions for the regulation of PUDs, and 24 V.S.A. § 4410, which grants a municipality the authority to employ "any other regulatory tools or methods" not listed within 24 V.S.A. §§ 4410–4427. The Town maintains that Regulations § 505 provides for PUD review and expressly permits the Commission to "modify [its Regulations] in accordance with 24 V.S.A. § 4417 subject to the . . . standards and conditions" for PUD permitting listed in the Regulations. (Town's Mot. for Summ. J. 20, filed Oct. 8, 2010; see Regulations § 505, 71.) The Town further argues that § 4417 does not limit the Commission from "invoking its implied authority to consider" conceptual master plan applications and that this authority is "incident and subordinate" to its authority to review PUD applications. (Town's Mot. 20; Town's Memo. in Opp'n to Appellant's Mot. for Summ. J. 5, filed Dec. 1, 2010.)

Additionally, the Town submits that its 30 year history of "conceptually considering PUD master plans" is an important planning tool that provides the Commission with a comprehensive overview of proposed development within the approximately 400-acre Killington Basin area, and that such historical review is allowed before the Town considers specific project applications. The Town claims that the Commission Order gives "no vested rights to land development" to Applicant, does not authorize any development within the Golf Course PUD, and does not provide for final PUD approval. (Town's Memo. in Opp'n 4.)

Applicant argues, in its second motion for summary judgment, that the Commission's authority to issue conceptual master plan approval for a PUD comes from the "unique and long-standing history of development" in the 400-acre area containing the proposed Golf Course PUD. (Applicant's Second Mot. 5–7.)[13]

---

[13] Applicant and the Town state, and Appellant agrees, that this history involves the submission by Applicant's predecessor in title of an initial "conceptual master plan" for the 400-acre area and approval of the plan by the Commission under the Regulations' PUD criteria. However, the parties disagree about the extent to which the Commission, between 1980 and today, has issued conceptual master plan approvals, as compared to full PUD approvals, for the 400-acre area. (See Joint Statement of Undisputed Facts of Applicant and Town ¶¶ 1, 3–4, filed Oct. 8, 2010; Stearns Aff. ¶ 10, filed Dec. 1, 2010.)

13

Applicant posits that a decision to review conceptual master plans is within the discretion of the Town in interpreting its own Regulations and that the Commission's authority to review conceptual master plans is implicit and not prohibited by the absence of a specific authorization.

Our analysis is focused upon locating some authority, specific or implicit, for the review that the Commission conducted. In so doing, we do not wish to detract from the important, voluntary processes that Applicant and its predecessors have engaged in to make neighbors and Town officials aware of the short- and long-range plans it may have for this significant resort area. By disclosing its overall plans in "five workshops, . . . numerous home owner association meetings, and . . . Open House[s] for the Killington community," Applicant has provided an important voluntary disclosure to its community. (Stipulated Statement of Undisputed Facts, Ex. A 3, ¶ 2, filed Aug. 23, 2010.) That this practice derives from a thirty year history by Applicant and its predecessors in title and management brings even more significance to these voluntary disclosures. But to rely upon this historical process for the authority to render quasi-judicial land use determinations would cause us to acknowledge authority where none exists.

Our municipal planning and development statutes provide that a municipality that has elected to adopt land use regulations or bylaws is empowered and encouraged to adopt PUD-specific regulations. 24 V.S.A. § 4417 ("Any municipality adopting a bylaw should provide for planned unit development . . . ."); see also 24 V.S.A. § 4303(26) ("'Should' means that an activity is encouraged but not mandated."). A reading of 24 V.S.A. § 4410 shows that a municipality is also empowered to "define and regulate land development in any manner that the municipality establishes in its bylaws" and "may utilize any or all of the tools provided in [24 V.S.A. §§ 4410–4427] and any other regulatory tools or methods not specifically listed."

Although there is no explicit authorization in Title 24 for municipalities to incorporate a preliminary review process for PUDs, as there is for subdivision review under 24 V.S.A. § 4418(2)(B), the grant of authority evidenced by the language of § 4410 and § 4417 is broad enough to include such action, as long as

14

it complies with these enabling statutes.  Section 4417 lists minimum provisions for PUD bylaws, two of which are "[t]he development review process to be used for review of [PUDs]" and "[s]tandards for the review of proposed [PUDs]."   § 4417(c).  When coupled with the broad grant of authority found in § 4410—that a municipality is empowered to "define and regulate land development in any manner that the municipality establishes in its bylaws"—it seems apparent a municipality has the flexibility to create a multi-stage review process for PUD approval.[14]

Thus, on Question 11 of Appellant's Statement of Questions, which asks "[w]hether 24 V.S.A. Section 4417 or any other chapter or subchapter of 24 V.S.A. Section 4401, et seq. authorizes a municipal planning commission to grant 'conceptual master plan' approvals," we **GRANT** summary judgment in favor of Applicant and the Town and **DENY** summary judgment to Appellant.  Our search now turns to whether the Town has established a PUD review procedure that includes conceptual master plan approval; our following analysis addresses the legal issues raised in Questions 1–3 and 12 of Appellant's Statement of Questions.

We first note that PUDs represent a deviation from conventional zoning regulations; they allow for flexibility from the rigidity of specific zoning provisions such as setbacks, minimum individual lot sizes, and district restrictions on uses.  See 24 V.S.A. § 4417(a); In re Pierce Subdivision Application, 2008 VT 100, ¶ 21, 184 Vt. 365 (discussing planned residential developments, which are regulatory tools similar to PUDs, and stating that the "Legislature authorized PRDs to 'encourage flexibility of design and development of land in such a manner as to promote the most appropriate use of land,'" citing the provisions previously found

---

[14] Appellant argues that 24 V.S.A. § 4410 and § 4417 must be read as alternates, such that § 4417 is a more specific provision negating the applicability of § 4410's language as to how a municipality can regulate PUDs.  We disagree that the language of § 4410 must be ignored.  Statutory provisions addressing the same subject matter "must be read together and construed as parts of a statutory system."  Rutz v. Essex Junction Prudential Comm., 142 Vt. 400, 405 (1983).  It is only when two statutory provisions conflict that a more specific one controls over a more general one.  See id.  Here, § 4417 addresses a municipality's regulation of PUDs whereas § 4410 addresses a municipality's regulation of land development generally, speaking to the flexibility a municipality has in this latter regard.  Because the provisions of § 4417 do not conflict with § 4410, particularly when made applicable to the proceedings now before this Court, the former can be read as part of a statutory system that incorporates the flexibility discussed in the latter.

15

in 24 V.S.A. § 4407(3), and now found, as amended, in 24 V.S.A. § 4417(a)). By allowing for deviations from conventional zoning, a community that has adopted PUD review provisions into its zoning regulations can incorporate unique building designs, can cluster buildings and uses, and can provide for the more efficient use of community resources and the preservation of open spaces and agricultural lands. Id. A community without PUD review authority may find such flexibility impossible because of its conventional zoning provisions.

Thus, when a municipality decides that it will provide for review of PUDs, it is establishing an alternate procedure for reviewing and approving proposed land development that does not conform to its conventional zoning regulations. This unique characteristic makes it even more important, dare we say essential, for PUD provisions to give prior notice of the specific procedures that will be employed when considering these plans. Thus, we conclude that when a community decides to administer PUD review, it must specifically establish and give prior notice, through its regulations, of the procedures that it will use to administer that review.

We now turn our review to the specific PUD review provisions in the Regulations. When interpreting municipal regulations we are directed to apply the same rules of construction as for statutes: we look first at the ordinary meaning of the regulation's plain language to give effect to the intent of the legislating body. See In re Stowe Club Highlands, 164 Vt. 272, 279–80 (1995); Town of Killington v. State, 172 Vt. 182, 188–89 (2001). The plain wording of both § 4410 and § 4417 makes clear that a multi-stage review process for PUD approval, to be valid, must be provided for in either a town's bylaws or officially adopted supplemental rules. The grant of authority in § 4410 is for a municipality to regulate development "in any manner that the municipality establishes in its bylaws." (emphasis added). We find no authority to simply create the process from whole cloth as an individual application is being reviewed.

Section 4417 lists minimum provisions for "[PUD] development bylaws adopted pursuant to this section" and provides examples of additional provisions a municipality may choose to incorporate into its PUD bylaws. (emphasis added). Bylaw is a defined term—"municipal regulations applicable to land development adopted under the authority of [the Vermont Planning and Development Act]"—

16

and any bylaws or amendments must be prepared and adopted pursuant to the process detailed in 24 V.S.A. §§ 4441–4442. 24 V.S.A. § 4303(4). Section 4417 also allows a municipal body to "prescribe . . . rules and regulations to supplement" its PUD bylaws, but these supplemental rules and regulations only become lawful once they have been formally adopted, after a public hearing. 24 V.S.A. § 4417(g).

Neither the Town nor Applicant have cited to any wording in the Regulations, or provided evidence of any duly adopted supplemental rules, that discuss conceptual master plan approval for a PUD proposal; the Town and Applicant's filings reveal no reference to set standards for a multi-stage review process. The terms "master plan" and "conceptual master plan" do not appear within § 505 or elsewhere in the Regulations.

The power to issue decisions granting conceptual plan approval cannot be implied from language in the Regulations; that power, if it exists, must be explicitly enacted, as so directed by the enabling statutes. If the Regulations were read to allow the Commission to employ a process for the issuance of conceptual master plan approval without codification of its procedures, the Commission would be empowered with the very "standardless discretion" that our Supreme Court has already rejected. Appeal of JAM Golf, 2008 VT 110, ¶ 17 (wherein the Court announced that "all ordinances are subject to the limits of our Constitution, and we will not enforce laws that are vague or those that delegate standardless discretion to town zoning boards," citing Handy, 171 Vt. at 348–49).[15] The Regulations include no description of a "conceptual master plan," what an applicant is required to submit to apply for conceptual master plan review, what a concerned neighbor may offer in challenging the proposed master plan, what the Commission is to consider when reviewing a conceptual master plan, and what the import is of a decision approving a conceptual master plan for a PUD. We decline

---

[15] We cite to Appeal of JAM Golf with caution, since that opinion has caused some consternation for municipal land use regulators. But in doing to, we specifically reject Applicant's assertion that the protections announced in Appeal of JAM Golf only flow in favor of a permit applicant. All statutory parties to land use proceedings are constitutionally entitled to prior notice of the procedures that will be employed when a proposed land development plan is reviewed for permit approval.

to give the Regulations a reading that would be unconstitutional and potentially result in invalidation of Regulations § 505.

We have also found no precedent to support the argument that an administrative practice, however long it has been employed and remained unchallenged, can result in implicit authority for municipal review and approval. Applicant cites to In re Champlain College Maple Street Dormitory in which this Court gave deference to the City of Burlington's consistently-applied interpretation of the term "unit" in its bylaws to mean "rooming unit" for dormitories. 2009 VT 55, ¶ 10, 186 Vt. 313. Here, there is no term or text in the Regulations for the Commission to have consistently interpreted; there is an absence of language to interpret. Thus, Applicant appears to argue that an ultra vires act, repeated over time, becomes a lawful practice. We find no precedent to support this argument, and ultimately we find no authority in the Regulations for the Commission to issue conceptual master plan approvals for a PUD. Thus we **GRANT** summary judgment in favor of Appellant on Questions 1–3 and 12 from Appellant's Statement of Questions and **DENY** the Town and Applicant's motions on these Questions. In effect, this renders the Commission Order **NULL** and **VOID** and requires that we **DISMISS** the remainder of this appeal and the party's motions for lack of a justiciable issue.

The conclusion this Court reaches does not speak to whether the Commission's process of considering conceptual master plans for PUDs is valuable. We note above (on page 14) the value of that voluntary community endeavor. Instead, our conclusion means that if the Town wishes to undertake this process it must either limit the process to informational discussions that do not create legal entitlements or codify the process in its Regulations or officially-adopted supplemental rules, with standards sufficient to satisfy a constitutional challenge. This Court is not, as the Town fears, "forcing a municipality to refuse" to consider a PUD application "on a 'conceptual' basis where [the municipal panel] is invited to do so by a compliant applicant." (See Town's Mot. 20.) We are merely stating that the Town must, in effect, make public the Commission's procedures and standards when it intends to render even partial factual findings and legal conclusions in order to ensure consistent and fair decision-making, as well as

18

notice to all interested parties of what an applicant must present to the Commission to gain approval. See <u>Handy</u>, 171 Vt. at 346–47 (describing consistent decision making and notice to landowners as the two most important rationales for finding standardless delegation in administrative adjudication unconstitutional).

### Conclusion

As more fully discussed above, we find that there presently exists no authority for the Planning Commission to issue a decision which contains partial factual findings, legal conclusions, and approval of a conceptual PUD master plan. Consequently, the Killington Planning Commission Findings of Fact, Conclusions of Law and Order of April 7, 2010 is **NULL** and **VOID** and of no further force or effect.

Applicant's motion for summary judgment on Appellant's standing is **DENIED.** We **GRANT** summary judgment in favor of Applicant and the Town on Question 11 (by which Appellant challenged the statutory authority of a municipality to enact conceptual master plan approval provisions as part of its land use regulations) and **GRANT** Appellant summary judgment on Questions 1, 2, 3, and 12 from Appellant's Statement of Questions (since the Town has not yet adopted specific procedures or standards for conceptual master plan approval within its PUD review provisions). In so doing, we **DENY** the competing motions filed by the opposing parties.

The remainder of this appeal is **DIMISSED** for lack of a justiciable issue. In so doing, we regard as moot the remainder of Applicant's, the Town's, and Appellant's motions.

A Judgment Order accompanies this Decision. This completes the current proceedings before this Court concerning the pending application.

Done at Newfane, Vermont, this 27th day of January 2011.

_____
Thomas S. Durkin, Judge

19